JUDGE CARTER

**UNITED STATES DISTRICT COURT**
**SHOUTREN DISTRICT OF NEW YORK**

**ISRAEL FARKASH,**

Plaintiffs,

- against -

**FIVE STAR TRAVEL INC., KALMAN EISDORFER, RACHEL EISDORFER, AHRON MORDECHI GLAUBER a/k/a AHRON MORDEHAI FRIEDMAN, MIRIAM GLAUBER, YONAH GLAUBER, G&G QUALITY CLOTHING INC., FILLMORE CT INC., J.T. Ruhaipari Vámszabadterületi Korlátolt Felelősségű Társaság, ELUZER HORVITZ, SHULEM HOROWITZ, SHIMON DAVID DAVIDOVIZ, FRIDA DAVIDOVIZ, NUCHEM WELTZ, EIZIK BRAUN, DOV PINCHAS SEGAL, JOHN DOE #1: through #60, and # JANE DOE 1 through # 60,**

Defendants.

## 1 8 CV 3699

Civil Action No.  CV

**JURY TRIAL DEMANDED**

COMPLAINT

Plaintiff, ISRAEL FARKASH, appearing pro se, as and for his complaint against the Defendants, respectfully alleges as follows:

### PRELIMINARY STATEMENT

1.  This action arises out of a fraudulent scheme perpetrated, by the defendants include, without limitation, the following: pursuant to the Racketeering Influenced Corrupt Organizations Act, 18 U.S.C. § 1961, et seq (RICO); violating of 18 U.S. Code § 1951 -2 Hobbs Act Extortion, By Force, Violence, Or Fear; Money Laundering; IRS Fraud; Bank Fraud; Customs fraud; Mail Fraud Under 18 U.S.C. § 1341; Wire Fraud Under 18 U.S.C. § 1343; 18 U.S. Code § 2315; 18 U.S. Code § 2315.

2.  Over a period of many years, defendants have used a network of alter-ego shell companies in furtherance of various schemes to defraud business parties, business counter parties, consumers, and others, as more fully described hereinbelow.

3.  The defendants herein acting primarily through the business activities of **AHRON**

**MORDECHI GLAUBER a/k/a AHRON MORDEHAI FRIEDMAN** and through and from behind the veil of DEFENDANT G&G QUALITY CLOTHING INC., have promoted and still continuously promote the said prohibited federal racketeering activities in a manner that directly affects both interstate and foreign commerce.

4.  The primary player in this fraudulent enterprise is (i) the **Crime Boss** namely Defendant Kalman Eisdorfer (ii), with his co-conspirators, include, without limitation, the Defendant Shimon David Davidoviz, this lawsuit arises out of a pattern of illegal conduct perpetrated by (the "RICO Defendants"), for many years, Defendants have used a network of alter-ego shell companies in furtherance of various schemes to defraud business counter parties and consumers through a pattern of racketeering activity, including multiple predicate acts chargeable under 18 U.S. Code § 2315; 18 U.S. Code § 2315 in violation of 18 U.S.C. § 1962(c).

## JURISDICTION AND VENUE

5.  This is an action brought pursuant to the Racketeering Influenced Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.*

6.  The Defendants are subject to personal jurisdiction in this State pursuant to 18 U.S.C. § 1965(d), and are also subject to personal jurisdiction in that they either reside in this State, engage in the transaction of business in this State and/or engaged in substantial activities within the State and/or committed a tortious act within this State. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 insofar as this is an action arising under the laws of the United States.

7.  This Court also has Supplemental Jurisdiction under 28 U.S.C. § 1367 over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

8.  Venue is proper in the Southern District of New York pursuant to 28 U.S.C. §

1391(b)(1) and (2) and (d) in that a substantial part of the events or omissions giving rise to the claims made in this action occurred in this District. In addition, pursuant to 18 U.S.C. § 1965(a), venue is proper in this district as one of the Defendants resides in this district, one of the Defendants acts as an agent for the other Defendants in this district, and all of the Defendants transact their affairs in this District.

## THE PARTIES

FIVE STAR TRAVEL INC., KALMAN EISDORFER, RACHEL EISDORFER, AHRON MORDECHI GLAUBER a/k/a AHRON MORDEHAI FRIEDMAN, MIRIAM GLAUBER, YONAH GLAUBER, G&G QUALITY CLOTHING INC., FILLMORE CT INC., J.T. Ruhaipari Vámszabadterületi Korlátolt Felelősségű Társaság, ELUZER HORVITZ, SHULEM HOROWITZ, SHIMON DAVID DAVIDOVIZ, FRIDA DAVIDOVIZ, NUCHEM WELTZ, EIZIK BRAUN, DOV PINCHAS SEGAL,

9.  All the claims duly sold, assigned and transferred to Israel Farkash

10. The Plaintiffs ISRAEL FARKASH is above the age of eighteen years, is a citizen of the State of New York, and is domiciled in Brooklyn, New York at 4118 14th Ave, suite 40 Brooklyn NY 11219.

11. The Defendant FIVE STAR TRAVEL INC., Upon information and belief is a company organized and incorporated under the laws of the State of New York, with its principal place of business located at 1427 54th St, Brooklyn, NY 11219

12. The Defendant KALMAN EISDORFER, 1427 54th Brooklyn NY 11219

13. The Defendant RACHEL EISDORFER; 1427 54th Brooklyn NY 11219

14. The Defendant AHRON MORDECHI GLAUBER a/k/a AHRON MORDEHAI FRIEDMAN, 1558 49th Street Brooklyn NY 11219 Upon information and belief he is the PRESIDENT of G&G QUALITY CLOTHING INC.

15.    The Defendant MIRIAM GLAUBER  1452 57TH Street Brooklyn, NY 11219.

16.    The Defendant YONAH GLAUBER 1654 50th Street Brooklyn NY 11204 Upon information and belief is a partner in G&G QUALITY CLOTHING INC.

**17.**    The Defendant G&G QUALITY CLOTHING INC. Upon information and belief is a company organized and incorporated under the laws of the State of New York, with its principal place of business located at 45 Forest Rd, Monoroe NY 10950.

18.    FILLMORE CT INC., 1230 51st Street, Brooklyn, NY 11219

19.    The Defendant **J.T. Ruhaipari Vámszabadterületi Korlátolt Felelősségű Társaság** 1558 49th Street  Brooklyn NY 11219.

20.    The Defendant ELUZER HORVITZ 1561 39th Street  Brooklyn NY 11218.

21.    The Defendant SHULEM HOROWITZ,  Upon information and belief was and is a citizen of the State of New York, residing at 1558 49th Street  Brooklyn NY 11219.

22.    The Defendant SHIMON DAVID DAVIDOVIZ, 10 Kdushas Yom Tov  Bnei Brak ISRAEL

23.    The Defendant FRIDA DAVIDOVIZ, 10 Kdushas Yom Tov Bnei Brak ISRAEL

24.    The Defendant NUCHEM WELTZ, Upon information and belief was and is a citizen of the State of New York, residing at 1230 51st  Brooklyn, NY 11219

25.   The Defendant EIZIK BRAUN, 1411 highland Ave Brooklyn NY 11224

26.   The Defendant DOV PINCHAS SEGAL  37 Maimon Street Bnei Brak ISRAEL 5132853.

27.   The Defendants JOHN DOE #1 through #10 are fictitious names representing persons of both gender, whose real names and identities are currently unknown to Plaintiff, and who have conducted and participated in, and conspired, confederated and agreed with the Defendants to conduct and participate in the affairs of the Enterprise through a pattern of racketeering activities in violation of 18 U.S.C. § 1962 (c) and (d), as more fully described below and to injure Plaintiff in his business and property by reason thereof. The Defendants are individuals capable of holding a legal or beneficial interest in property and are therefore "persons" within the meaning of 18 U.S.C. § 1961(3).

28.   Defendant XYZ Corporations #1 through # 10 are corporations, partnerships and other business entities or organizations whose real names and identities are currently unknown to Plaintiff, and who have conducted and participated in, and conspired, confederated and agreed with the Defendants to conduct and participate in the affairs of the Enterprise through a pattern of racketeering activities in violation of 18 U.S.C. § 1962 (c) and (d), as more fully described below and to injure Plaintiff in his business and property by reason thereof. The Defendants are entities capable of holding a legal or beneficial interest in property and are therefore "persons" within the meaning of 18 U.S.C. § 1961(3).

**THE DEFENDANTS CONDUCTED A RICO ENTERPRISE THROUGH A PATTERN OF RACKETEERING ACTIVITY IN FURTHERANCE OF THEIR CONSPIRACY TO VIOLATE 18 U.S.C. $ 1962(c). IN VIOLATION OF 18 U.S.C. $ 1962(d)**

29.    At all relevant times, FIVE STAR TRAVEL INC., KALMAN EISDORFER, RACHEL EISDORFER, AHRON MORDECHI GLAUBER a/k/a AHRON MORDEHAI FRIEDMAN, YONAH GLAUBER, G&G QUALITY CLOTHING INC., FILLMORE CT INC., J.T. Ruhaipari Vámszabadterületi Korlátolt Felelősségű Társaság, ELUZER HORVITZ, SHULEM HOROWITZ, SHIMON DAVID DAVIDOVIZ, FRIDA DAVIDOVIZ, NUCHEM WELTZ, EIZIK BRAUN, DOV PINCHAS SEGAL, (collectively referred to herein as the "Defendants" or "RICO Defendants") were associated in fact together for the common purpose of engaging in the course of conduct described herein. Defendants formed and conducted an association-in-fact which operated as a RICO "enterprise" (herein after the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) & (d) and which was engaged in, and whose activities affected interstate and foreign commerce. The individuals and entities that associated together to form this association-in-fact enterprise functioned as a continuing unit.

30.    At all relevant times, and from at least June of 2007 to the present time, the Defendants were associated with the Enterprise and conducted or participated, directly or indirectly, in the management and operation of the affairs of the Enterprise through a "pattern of racketeering activity" within the meaning of 18. U.S.C. § 1961(5). The acts constituting the "pattern of racketeering activity" were horizontally related to each other and were connected in their nature and purpose to each other and to other acts of racketeering by virtue of common participants, their relationship to the same Enterprise, a common victim (the Plaintiff), a

common method of commission, and the common purpose and common result of defrauding and causing injury to the Plaintiff. The acts constituting the pattern of racketeering activity were vertically related to the Enterprise.

31.   The pattern of racketeering activity engaged in and conducted by the Defendants have been continuous from at least June 2007 to date. Moreover, the pattern of racketeering activity committed by the Defendants is open-ended, in that it has no predetermined end date, and is continuous in that the scheme is and was the Defendants' regular way of operating and conducting themselves and/or their ongoing business and thus there exists the threat of continuing long-term racketeering activity.

32.   Each Defendant has conducted or participated, directly or indirectly, in the management and operation of the affairs of the Enterprise through a "pattern of racketeering activity" through the commission of multiple acts of racketeering, including acts of "mail fraud" in violation of 18 U.S.C, 1341, "wire fraud" in violation of 18 U.S.C. § 1343, extortion and conspiracy to commit and attempted extortion in violation of 18 U.S.C. §1951

33.   At all relevant times, Defendants were associated with the enterprise and agreed and conspired to violate 18. U.S.C. § 1962(c), that is, the Defendants conspired, confederated and agreed together to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, all in violation of 18 U.S.C. § 1962(d).

34.   Plaintiff has suffered a substantial injury to his business and property by reason

of, and as the result of, the Defendants' commission of the enumerated racketeering acts in furtherance of the Defendants' conspiracy to violate of 18 U.S.C. § 1962(c), all in violation of 18 U.S.C. § 1962(d) and § 1964(c).

## THE DEFENDANTS' SCHEME TO DEFRAUD THE PLAINTIFF AND TO OBTAIN HIS PROPERTY THROUGH EXTORTION

35.     The RICO Defendants, acting together in concert and conspiracy, have participated in a continuously running scheme, dating from at least 2007 and lasting to present time, in which, acting jointly and severally, they have, among other acts, made fraudulent property conveyances, arranged for and obtained fraudulent mortgages, committed bank fraud, insurance fraud, bankruptcy fraud, forgery and extortion in order to achieve and conceal their scheme to defraud.

36.     These RICO defendants have made a career of targeting persons, such as the Plaintiff, which they assess to be potentially vulnerable victims and who they thereafter entice with promises of financial gain if they participate financially as an investor/lender in a staged "real estate venture," which unknown to the victim, is entirely fraudulent and designed solely to steal the property of their targeted victim.

37.     As more fully described hereinbelow, the business activities of DEFENDANT G&G QUALITY CLOTHING INC., as well as the herein defendants continuous promoting of prohibited racketeering activities while acting through, and from behind the corporate veil of Defendant G&G QUALITY CLOTHING INC., directly affects both interstate and foreign commerce.

## **FACTUAL BACKGROUND**

38.   As part of the RICO Defendants' scheme and artifice to defraud, In 2007 the Defendant Kalman Eisdorfer a first cousin to Daskal and his wife Rachel Eisdorfer from Borough Park, Brooklyn, met Daskal to get his advice and directives on their plan to invest in a project in a certain real estate in Romania, stating that they were referred by G&G to meet.

39.   On June 2007 Kalman Eisdorfe at his first meeting with Dov Daskal told him that he plans to invest some close to two million dollars into that project.

40.   Kalman Eisdorfer in his second meeting On June 2007 made clear to Dov Daskal that he will make the investment through his close friend Glauber, because Glauber has a lot of black money from his G&G corporations, monies that G&G corporations is not reporting; also because G&G uses their Hungarian company J.T. operations to cover up income tax evasion for G&G, See **Exhibits "A" & "H"** attached hereto and incorporated herein as a part of this complaint, therefore, Glauber will provide for Eisdorfer said black money to invest in said real estate in Romania.

41.   Kalman Eisdorfer than provided through an intermediary close to two million dollars in Romania (Daskal was told that it is coming from Glauber in Hungary) for investment in Daskal's project.

42.   It is believed that Glauber and Eisdorfer were partners in one way or another in this investment and money exchange.

43.  On July 1, 2007  Dov  Daskal sent a fax  approval to Kalman Eisdorfer for receiving $850,000.00

44.  On July 12, 2007   Dov   Daskal sent   a contract agreement  for the full $1,346,789.00

45.  On November 1, 2007   Dov   Daskal had provided the receipt approval for receiving $1,346,789.00 and included in said receipt his personal guarantee on the 1,346,789.00   With a contract agreement attached.

46.  Sometime thereafter, in 2008, the project failed, Shimon David Davidoviz with the Cooperation of Kalman Eisdorfer had terrorized Daskal using violence to force him to agree to arbitrate by an arbitration of rabbis of their choice.

47.  Said coercion was including,  but not Limited to the sever beating by Shimon David Davidoviz that took place on April or May 2009 about one month before the first arbitration.

48.  Said coercion was including,  but not Limited to the severe beating by Kalman Eisdorfer and  Eizik braun that took place On December 11, 2008 at a hotel in Jerusalem one month before the first arbitration.

49.  Shimon David Davidoviz used to come to the U.S.A. with the Cooperation of Kalman Eisdorfer to defraud misuse of funds and embezzlement when he insists on people  to donate to institutions that are  not existing and abuse said charities for money-laundering  for G&G

50.    Sometime in 2010, Eisdorfer forced Daskal into Beth Din in Israel to the infamous Rabbi Shafran

51.    Eisdorfer in the interim during the pendency of the Beth Din proceeding, got an injunction in an Israeli court against Daskal moving any of his personal assets.

52.    Shafran in his ruling states that Eisdorfer invested CASH! it was confirmed in the court confirmation ruling.

53.    After the ruling from Shafran came down, Eisdorfer and his wife filed in May of 2012 for an involuntary bankruptcy petition against Dov Daskal personally, to recover what he had, in the Israel bankruptcy court. The petition was approved in November 2012, when the order of relief was given.

54.    Soon as the order of relief came down same month in November 2012, the Bankruptcy Trustee filed an adversary proceeding to seize Hamerkaz, claiming that it is an asset owned by  Dov Daskal, and must be sold on auction by the Bankruptcy court.

55.    During the proceeding, there were sealed filings of the true owners, Perlmutter (brother-in-law of Ahron Glauber, but not on good terms)

56.    The trustee ultimately made a settlement with Hamerkaz (who did not want a protracted fight, which would have damaged the business, and the real owner's interests) for some close to $900,000 USD.

57.   Hamerkaz made the settlement with the trustee in December of 2012, and paid most or all of the installment of a said amount between December 2012 and February of 2013.

58.   It became clear to Hamerkaz that Glauber together with Brown and Eisdorfer had planned to defraud Hamerkaz, so G&G would be able to the Hamerkaz company, though they did not succeed, they did succeed in stealing some $900,000 from Hamerkaz.

59.   While the aforementioned took place in 2012, Hamerkaz was having problems to keep up with paying G&G as before, as a result of the $900,000 unjust loss to Glauber and Eisdorfer, and G&G started to make trouble to sell to Hamerkaz, threatening to stop selling. It was obvious that Gluaber was now resorting to his second stage, since he and Eisdorfer did not manage to steal Hamerkaz, and only managed to get $900,000, Glauber wanted to keep extorting and finally take over the market for himself, so he threatened Hamerkaz.

60.   It was then when Glauber informed Hamerkaz that unless they procure a guarantor for G&G, that they will not continue to deal anymore with Hamerkaz. Essentially, Glauber knew that one of the two will happen: (1) he puts Hamerkaz out of business and gets to own the market, or (2) Hamerkaz produces a guarantor, and he would then extort the guarantor and Hamerkaz.

61.   This is when Chaim Stern came into the picture, and in February 2013 Chaim signed the guaranty.

62. Unknown to Chaim, Glauber had managed to place Dov Daskal into Bankruptcy with Eisdorfer's help, and he also managed to place Hamerkaz in the direct scrutiny of the Bankruptcy Court in the months leading up to the guaranty signing. Also unknown to Chaim that he became liable for the money from Hamerkaz past due as a direct result of Glauber and Eisdorfer in cahoots stealing from Hamerkaz, so now Chaim would pay for it, but without a clue that this was a pre-planned act.

63. Chaim Stern as a precautionary measure for his own security, undertook to make some very basic checks on Hamerkaz and it's owners, to make sure he is not hedging a dead horse.

64. Chaim was informed in the days before signing that the of Hamerkaz is Izzy Perlmutter who's family was well known to Chaim, and Chaim had no reason to suspect any foul play. So was Hamerkaz known as a stable business for many years, and he had no reason to suspect anything fishy was playing behind the scenes. he was informed that there are simple business issues that Hamerkaz has, and that a short-term guaranty would be needed to keep their business. Chaim had no information on the intricate between G&G and Hamerkaz or between Daskal and Glauber, he had no reason to believe anything else was going on.

65. The information on the ownership Chaim got from an acquaintance in Israel a certain Natty Galant, who had looked into the Israeli company registrar and basically gave Chaim whatever info he needed to make sure he is hedging a stable business and stable owners.

66.　At no time did Chaim know nor had any reason to suspect that Dov Daskal was the owner, or that he was in Bankruptcy court, he was made aware of the Hamerkaz history that Daskal was its manager and that it was sold to Perlmutter, and as far as Chaim was concerned, he was satisfied as would anyone else in his shoes

67.　Gluaber of course did not inform Chaim of the Bankruptcy proceedings against Dov and Hamerkaz, but foolishly included in the guaranty verbiage that Chaim is obligated to pay even if Hamerkaz becomes subject to bankruptcy. Glauber also commingled Dov Daskal and Hamerkaz in the definitions of the instrument so that they will look like one.

68.　Chaim of course does not read the instrument and relies on his information and on assurances from Vann that all agreements are incorporated, he thinks he is dealing with straight people and signs off on the instrument.

69.　(As will be covered more fully below, Glauber did not reveal at that time his fraudulent scheme, as he had to keep it secret of course. But when Glauber filed the action for G&G in April 2017, he revealed in his affidavit that among the reasons he needed the guaranty was: that Dov Daskal was in Bankruptcy, and that Hamerkaz may become subject to the Bankruptcy court, and therefore he may be unable to collect payment, so he needed a guaranty. Without going into the details of this scheme and as will be further explained -also evident from Glaubers admission in court now- Glauber clearly wanted to keep this precise info a secret from Chaim, hoping Chaim would not discover this info)

70.   Chaim believing that the guaranty is expiring on its own terms a year later, keeps paying G&G to their Chinese companies between Summer of 2013 and Winter of 2014, and believes all is good, and waited to hear from Hamerkaz when they would make good on the money paid out to G&G, not wanting to bother them knowing they needed time to get back on their foot. Chaim makes no contact with G&G, he knew the company or the owner would pay him back when they can.

71.   a copy of Affidavit of Chaim Stern, dated July 25, 2017 ("Stern Aff.")  the Document that sets forth  these facts is annexed hereto as **Exhibit " B."**

72.   **Then something else took place:**

73.   In March of 2015, Dov Daskal is in New York, he meets with Glauber in G&G offices, when Glauber  handed him a paper and tells him that unless he signs  said paper, in which Daskal is to admit he is the owner of Hamerkaz, then G&G will stop doing business with Hamerkaz, and Daskal will lose his job and livelihood.

74.   Daskal facing a formidable situation, of not only losing his job, but also be liable to the owners for selling a company that is worthless now, facing no choice, and after begging and pleading with Glauber not to do that to him, he signed on the paper. Glauber assured him that he only needs it for his records and that he is sealing it in an envelope in front of Daskal and that it will not be used.

75.   Thereafter, business resumed with G&G, and no one was told about this, so Daskal believed that no one beside him and Glauber knows or will ever know about this.

76.    A day later and unknown to Daskal, Glauber threatened another employee of his (Klein, see below) who is a notary, telling him that he must notarize the confession document by Daskal said notary despite clearly know and saw all scheme had no choice and did so.

77.    G&G had one of its employees a certain person Mr. Klein who was overseeing the accounting and many financial operations of G&G and JT and other companies, and was privy to many of the illegal conduct going on at G&G.

78.    Sometime in between March and September of 2016, Klein became restless having a guilty conscious, realizing that he became a partner to Glauber's crime in extorting Daskal for the confession document, He also realized that he damaged Chaim Stern, realizing that Hamerkaz is a matter of time before it is downed with this document, and knowing that Gluaber is going to extort Chaim while leaving Chaim with nowhere to recover the funds from.

79.    After a few months, Klein decided that he must do something morally and religiously, and while he was unable to face Daskal, and could not talk to him about this, he decided to let Chaim Stern know about it, and hoped that Chaim would find a way to deal with it together with Hamerkaz.

80.    Klein reached out to someone in Hamerkaz and asked that he wants to get in touch with Stern related to the guaranty, but did not say what, and asked if they can have Stern contact him.

81. That person then contacted Natty Galant and asked him to talk with Klein and see what the issue is to do with Stern. Klein then informed Galant of the confession event, he told him he cannot face Daskal and Stern for this, and if he can inform Stern about it, and find a way to convey his regret to Daskal and Hamerkaz, and that they be aware.

82. Galant, then spoke with Daskal who asked him not to inform the owners as he is afraid Glauber will act to stop doing business, but to instead inform Chaim Stern and let him do whatever he can to save him.

83. Galant provided to Chaim a letter from the attorney which stated that the true owner in 2013 was Perlmutter, and that Rutner had subsequently bought out Perlmutter, and that Daskal was not the real owner, and that the extortion scheme is an illegal scheme. The attorney advised him to send notice of termination.

84. When Chaim got the information he realized he was duped and fooled by Glauber, and that not only did Glauber make the extortion scheme, but that Glauber fooled him to sign a guaranty other than what was discussed, he realized he signed a guaranty that may still be valid. He immediately tried to contact Glauber, but got no response. Chaim facing no other way and being afraid for further liability then sent a notice of termination to Glauber in the mail, after he still got no response, Chaim sent a final email to Glauber to return the original papers to him, which Glauber again did not respond to.

85. Chaim was also informed by Galant that Glauber and Hamerkaz had made a deal to pay all balances due and future accruals by paying 1,800,000 in monthly

installments, and which was being paid, and explained to Chaim that there was no monies owed that G&G would collect from him up to that point As detailed in the accompanying Affirmation of Bracha Ester Kauftheil, dated July 24, 2017 ("Kauftheil Aff."), the longtime bookkeeper for Hamerkaz, after accounting for all debits and credits accumulating during the lengthy relationship between Hamerkaz and G&G, Hamerkaz actually has a credit balance of at least $201,010. (Kauftheil Aff.) . A copy of the   Document that sets forth  these facts is annexed hereto as Exhibit " C."

SUBSEQUENT EVENTS IN 2017:

86.    During late April the Bankruptcy trustee opened the old adversary proceeding against Daskal and Hamerkaz. It became evident that Glauber and Eisdorfer were behind it, and were implementing their next stage of the scheme.

87.    The trustee said in opening that re-proceeding that he received the info from a certain  DOV PINCHAS SEGAL, who is known to work with Glauber and Eisdorfer, the trustee says that DOV PINCHAS SEGAL went to the USA to get the confession document from Daskal, but he does not say from whom. He also says that he got the info from Eisdorfer, and he includes emails from G&G to Hamerkaz and Daskal.

88.    In March 7, 2017 an employee and accomplice of Glauber started to send Daskal extortion messages in What's App, telling him they are going to unseal and open the envelope... (confession), he then tells him that unless he pays G&G, he is

going to make money from that paper (confession paper) and he then attaches a photo of the paper in What's App.

89. On April 25, 2017, the trustee got an injunction and order to grab records and install cameras on Hamerkaz, the order was under seal. The court then sent the trustee and Hamerkaz the order, but mistakenly attached exhibits which the trustee had given the court under seal and ex-parte not to be given to Hamerkaz, but the court now mistakenly attaches them, among them was the confession document by Daskal, so now we find out what Glauber is doing (but we cannot admit this, because the attorney in Israel has a duty to keep his mouth even from his client so we cannot cause him trouble in divulging this).

90. Within a few days the judge unsealed it on Hamerkaz request, and it became obvious what Glauber's scheme was the whole time.

91. Now as to Glauber's affidavit in April 2017 in the NY court action:

- Glauber did not inform Chaim anything about this at anytime, thugh he
- knew the info. Galuber purposely included in the guaranty verbiage to make Chaim believe that there is no bankruptcy, by stating that even if it would become subject to, he is still liable.

- Glauber works behind the scenes to bring about a involuntary bankruptcy against Daskal.

- Glauber than extorts Daskal after telling him he will destroy Hamerkaz.

- Glauber then continues to extort hamerkaz, despite their 2015 up-to-date payments on their agreement.

- Glauber then continues to extort Hamerkaz continuously seeking monies not owed.

- He continues to extort Stern at the same time.

- He gets money from Hamerkaz, but does not report it as a credit, thereby damaging both Hamerkaz and Chaim.

- he then perpetrates a fraud on the invoices.

- he continues to implement the confession, which he knows was a lie, and which he knows was damaging both Hamerkaz and Chaim Stern.

92.   To make it simple, if Glauber had believed that Daskal was the owner as he makes believe in his April 2017 affidavit, and as evident from his extortion scheme in 2015 and before, then why did he keep the info to use it for his personal gain to destroy Hamerkaz, and did not inform the Bankruptcy court.

93.   On the other hand, if Glauber believed Daskal was not the real owner, then why did he use this as a means to destroy Hamerkaz and Chaim, if not for his own personal gain and to further his scheme.

94.   Moreover, since Glauber states in his affidavit that he needed Chaim's guaranty to protect his interest on payment from hamerkaz, (aside from the fact that he acted with Malice to damage Chaim and his subrogation rights intentionally and in a calculated manner), he clearly had no use of the confession instrument, because one he had already secured Chaim's guaranty, and two, if he does use the confession document in Bankruptcy court as he now did, how is he going to get his money from Hamerkaz, unless he was to use his scheme of stealing Hamerkaz for pennies in an auction,but not before he would first try to extort, Daskal, Hamerkaz, and Chaim.

95.   On the other hand, if Glauber did not believe that Daskal was an owner and that Hamerkaz would become subject to Bankruptcy, then why did he need a guaranty

from Chaim as he claims in his affidavit, if not for his illegal extortion scheme as it turned out to be proven now

96.   Furthermore, Glauber only provided the confession document to the Bankruptcy court, after he had already extorted Hamerkaz the max he can, and only after he realized he cannot extort Chaim through the crooked Rosenberg and Beth Din. If Glaubver was honest how come he did business with Hamerkaz when he believed and knew it is supposed to be in Bankruptcy, if not that he is in bed with Brown, Eisdorfer, and behind this whole scheme.

97.   (Interestingly, Glauber sometime in 2015 made a settlement with the IRS to pay back for his illegal black moneys in Switzerland. This he told Daskal many times asking him to send payments to vann  Esq. needed to pay off his IRS settlement obligations) See the **Exhibit " D."**  attached hereto and incorporated herein as a part of this complaint,

98.   As detailed hereinabove   FIVE STAR TRAVEL INC., conducts its' business, through its' current operators, KALMAN EISDORFER, and other defendants herein, styled in the manner of a mafia run racketeering business.

99.   As detailed hereinabove, in addition to the aforesaid frivolous litigation campaign, the aforesaid defendants in order to further shake down the Plaintiffs so that they can be certain to wrest away the plaintiffs business ownership rights, did also during their litigation campaign resort to bribery, extortion threats, theft, mail fraud, wire fraud and other RICO crimes, all of which are described in the herein complaint.

100.    Defendant FIVE STAR TRAVEL INC., As detailed hereinabove is named herein as a party defendant for damages and injuries caused to Plaintiff ISRAEL FARKASH by his continuous commission of fraudulent acts and promoting racketeering crimes, resulting in a pattern of racketeering activity as defined in 18 United States Code §1962; and falling within the parameters of the prohibited activities proscribed by 18 United States Code §1961, including, but not limited to, mail fraud, wire fraud, death threats, extortion, transportation of goods in interstate and foreign commerce that were knowingly obtained by means of false or fraudulent pretenses and representations, and having derived income directly from a pattern of racketeering activity in violation of 18 USC §1962, while acting on behalf of himself and while acting in concert with other defendants herein, and with the intent of causing, and having directly caused, damage and loss to property of Plaintiff ISRAEL FARKASH, and business belonging to Plaintiff ISRAEL FARKASH, as well as to unjustly enrich himself and the other defendants herein.

101.    Defendant KALMAN EISDORFER, As detailed hereinabove is named herein as a party defendant for damages and injuries caused to Plaintiff ISRAEL FARKASH by his having masterminded a continuous commission of fraudulent acts all while promoting racketeering crimes resulting in a pattern of racketeering activity as defined in 18 United States Code §1962; and falling within the parameters of the prohibited activities proscribed by 18 United States Code §1961, including, but not limited to having utilized a chain of alter ego shell companies/corporations to engage in multiple sham transactions that furthered the

said defendant's schemes while disguising and concealing their corporate identities including, but not limited to, to the sever beating by Defendant KALMAN EISDORFER that took place On December 11, 2008 at hotel in Jerusalem See **Exhibits "G"** attached hereto and incorporated herein as a part of this complaint which reflect solid evidence of a money laundering scam and artifice of monetary conversion.

102.   Mail fraud, wire fraud, death threats, extortion, transportation of goods in interstate and foreign commerce that were knowingly obtained by means of false or fraudulent pretenses and representations, and having derived income directly from a pattern of racketeering activity in violation of 18 USC §1962, while acting on behalf of himself and while acting in concert with other defendants herein, and with the intent of causing, and having directly caused, damage and loss to property of Plaintiff ISRAEL FARKASH, and business belonging to Plaintiff ISRAEL FARKASH, as well as to unjustly enrich himself and the other defendants herein.

103.   Defendant RACHEL EISDORFER, As detailed hereinabove is named herein as a party defendant for damages and injuries caused to Plaintiff ISRAEL FARKASH by her continuous commission of fraudulent acts and promoting racketeering crimes, resulting in a pattern of racketeering activity as defined in 18 United States Code §1962; and falling within the parameters of the prohibited activities proscribed by 18 United States Code §1961, including, but not limited to, mail fraud, wire fraud, death threats, extortion, transportation of goods in interstate and foreign commerce that were knowingly obtained by means of false or fraudulent

pretenses and representations, and having derived income directly from a pattern of racketeering activity in violation of 18 USC §1962, while acting on behalf of himself and while acting in concert with other defendants herein, and with the intent of causing, and having directly caused, damage and loss to property of Plaintiff ISRAEL FARKASH, and business belonging to Plaintiff ISRAEL FARKASH, as well as to unjustly enrich himself and the other defendants herein.

104.    Defendant AHRON MORDECHI GLAUBER a/k/a AHRON MORDEHAI FRIEDMAN, As detailed hereinabove is named herein as a party defendant for having caused damages and injuries to Plaintiff ISRAEL FARKASH by his having masterminded a continuous commission of fraudulent acts all while promoting racketeering crimes resulting in a pattern of racketeering activity as defined in 18 United States Code §1962; and falling within the parameters of the prohibited activities proscribed by 18 United States Code §1961, including, but not limited to having utilized a chain of alter ego shell companies/corporations to engage in multiple sham transactions that furthered the said defendant's schemes while disguising and concealing their corporate identities, See **Exhibits "A" & "H"** attached hereto and incorporated herein as a part of this complaint, both of which reflect solid evidence of a money laundering scam and artifice of monetary conversion.

105.    Mail fraud, wire fraud, death threats, extortion, transportation of goods in interstate and foreign commerce that were knowingly obtained by means of false or fraudulent pretenses and representations, and having derived income directly from a pattern of racketeering activity in violation of 18 USC §1962, while acting

on behalf of himself and while acting in concert with other defendants herein, and with the intent of causing, and having directly caused, damage and loss to property of Plaintiff ISRAEL FARKASH, and business belonging to Plaintiff ISRAEL FARKASH, as well as to unjustly enrich himself and the other defendants herein.

106. Defendant MIRIAM GLAUBER is the wife of defendant AHRON MORDECHI GLAUBER and his partner in crime to cover up their fraudulent scheme as detailed hereinabove both together made extensive plans effectuating the intended scheme with AHRON MORDECHI GLAUBER, and with the business G&G QUALITY CLOTHING INC., See Exhibits **"A" & "H"** attached hereto and incorporated herein as a part of this complaint, both of which reflect solid evidence of a money laundering scam and artifice of monetary conversion.

107. As detailed hereinabove is named herein as a party defendant for damages and injuries caused to Plaintiff ISRAEL FARKASH by her continuous commission of fraudulent acts and promoting racketeering crimes, resulting in a pattern of racketeering activity as defined in 18 United States Code §1962; and falling within the parameters of the prohibited activities proscribed by 18 United States Code §1961, including, but not limited to, mail fraud, wire fraud, death threats, extortion, transportation of goods in interstate and foreign commerce that were knowingly obtained by means of false or fraudulent pretenses and representations, and having derived income directly from a pattern of racketeering activity in violation of 18 USC §1962, while acting on behalf of himself and while acting in concert with other defendants herein, and with the intent of causing, and having

directly caused, damage and loss to property of Plaintiff ISRAEL FARKASH, and business belonging to Plaintiff ISRAEL FARKASH, as well as to unjustly enrich himself and the other defendants herein.

108.   Defendant   YONAH GLAUBER   is a brother of of defendant AHRON MORDECHI GLAUBER and his partner in crime to cover up  their fraudulent scheme as detailed hereinabove both together made extensive plans effectuating the intended scheme with AHRON MORDECHI GLAUBER, and with the business G&G QUALITY CLOTHING INC., See **Exhibits "A" & "H"** attached hereto and incorporated herein as a part of this complaint,  both of which reflect solid evidence of a money laundering scam and artifice of monetary conversion.

109.   As detailed hereinabove YONAH GLAUBER is named herein as a party defendant for damages and injuries caused to Plaintiff ISRAEL FARKASH by his continuous commission of fraudulent acts and promoting racketeering crimes, resulting in a pattern of racketeering activity as defined in 18 United States Code §1962; and falling within the parameters of the prohibited activities proscribed by 18 United States Code §1961, including, but not limited to, mail fraud, wire fraud, death threats, extortion, transportation of goods in interstate and foreign commerce that were knowingly obtained by means of false or fraudulent pretenses and representations, and having derived income directly from a pattern of racketeering activity in violation of 18 USC §1962, while acting on behalf of himself and while acting in concert with other defendants herein, and with the intent of causing, and having directly caused, damage and loss to property of Plaintiff ISRAEL FARKASH, and business belonging to Plaintiff ISRAEL

FARKASH, as well as to unjustly enrich himself and the other defendants herein.

110.    Defendant G&G QUALITY CLOTHING INC., See **Exhibits "A" & "H"** attached hereto and incorporated herein as a part of this complaint, both of which reflect solid evidence of a money laundering scam and artifice of monetary conversion.

111.    As detailed hereinabove G&G QUALITY CLOTHING INC., is named herein as a party defendant for damages and injuries caused to Plaintiff ISRAEL FARKASH by his continuous commission of fraudulent acts and promoting racketeering crimes, resulting in a pattern of racketeering activity as defined in 18 United States Code §1962; and falling within the parameters of the prohibited activities proscribed by 18 United States Code §1961, including, but not limited to, mail fraud, wire fraud, death threats, extortion, transportation of goods in interstate and foreign commerce that were knowingly obtained by means of false or fraudulent pretenses and representations, and having derived income directly from a pattern of racketeering activity in violation of 18 USC §1962, while acting on behalf of himself and while acting in concert with other defendants herein, and with the intent of causing, and having directly caused, damage and loss to property of Plaintiff ISRAEL  FARKASH, and business belonging to Plaintiff ISRAEL   FARKASH, as well as to unjustly enrich himself and the other defendants herein.

112.    Defendant FILLMORE CT INC.,  is named herein as a party defendant for damages and injuries caused to Plaintiff ISRAEL  FARKASH by his continuous

commission of fraudulent acts and promoting racketeering crimes, resulting in a pattern of racketeering activity as defined in 18 United States Code §1962; and falling within the parameters of the prohibited activities proscribed by 18 United States Code §1961, including, but not limited to, mail fraud, wire fraud, death threats, extortion, transportation of goods in interstate and foreign commerce that were knowingly obtained by means of false or fraudulent pretenses and representations, and having derived income directly from a pattern of racketeering activity in violation of 18 USC §1962, while acting on behalf of himself and while acting in concert with other defendants herein, and with the intent of causing, and having directly caused, damage and loss to property of Plaintiff ISRAEL FARKASH, and business belonging to Plaintiff ISRAEL FARKASH, as well as to unjustly enrich himself and the other defendants herein.

113.    The defendant J.T. Ruhaipari Vámszabadterületi Korlátolt Felelősségű Társaság, INC., See **Exhibits "A" & "H"** attached hereto and incorporated herein as a part of this complaint, both of which reflect solid evidence of a money laundering scam and artifice of monetary conversion.

114.    Is named herein as a party defendant for damages and injuries caused to Plaintiff ISRAEL FARKASH by his continuous commission of fraudulent acts and promoting racketeering crimes, resulting in a pattern of racketeering activity as defined in 18 United States Code §1962; and falling within the parameters of the prohibited activities proscribed by 18 United States Code §1961, including, but not limited to, mail fraud, wire fraud, death threats, extortion, transportation of goods in interstate and foreign commerce that were knowingly obtained by means

of false or fraudulent pretenses and representations, and having derived income directly from a pattern of racketeering activity in violation of 18 USC §1962, while acting on behalf of himself and while acting in concert with other defendants herein, and with the intent of causing, and having directly caused, damage and loss to property of Plaintiff ISRAEL FARKASH, and business belonging to Plaintiff ISRAEL FARKASH, as well as to unjustly enrich himself and the other defendants herein.

115. Defendant ELUZER HORVITZ, is an executive director at G&G, and believed to be fully familiar with fraudulent acts and promoting racketeering crimes, resulting in a pattern of racketeering activity, is named herein as a party defendant for damages and injuries caused to Plaintiff ISRAEL FARKASH by his continuous commission of fraudulent acts and promoting racketeering crimes, resulting in a pattern of racketeering activity as defined in 18 United States Code §1962; and falling within the parameters of the prohibited activities proscribed by 18 United States Code §1961, including, but not limited to, had participate with AHRON MORDECHI GLAUBER, preparing the fraudulent document, in which Daskal is to admit he is the owner of Hamerkaz; mail fraud, wire fraud, death threats, extortion, transportation of goods in interstate and foreign commerce that were knowingly obtained by means of false or fraudulent pretenses and representations, and having derived income directly from a pattern of racketeering activity in violation of 18 USC §1962, while acting on behalf of himself and while acting in concert with other defendants herein, and with the intent of causing, and having directly caused, damage and loss to property of Plaintiff

ISRAEL FARKASH, and business belonging to Plaintiff ISRAEL FARKASH, as well as to unjustly enrich himself and the other defendants herein.

116.   Defendant SHULEM HOROWITZ, had participated with AHRON MORDECHI GLAUBER, preparing the document, in which Daskal is to admit he is the owner of Hamerkaz is named herein as a party defendant for damages and injuries caused to Plaintiff ISRAEL FARKASH by his continuous commission of fraudulent acts and promoting racketeering crimes, resulting in a pattern of racketeering activity as defined in 18 United States Code §1962; and falling within the parameters of the prohibited activities proscribed by 18 United States Code §1961, including, but not limited to, that, that on May 2017 Defendant SHULEM HOROWITZ slandered the Company (Daskal Hamerkaz L 'Halbasha Americait) Specifically states that: including but not limited to that, that the company (Daskal Hamerkaz L 'Halbasha Americait) stole three million Dollar from G&G; mail fraud, wire fraud, death threats, extortion, transportation of goods in interstate and foreign commerce that were knowingly obtained by means of false or fraudulent pretenses and representations, and having derived income directly from a pattern of racketeering activity in violation of 18 USC §1962, while acting on behalf of himself and while acting in concert with other defendants herein, and with the intent of causing, and having directly caused, damage and loss to property of Plaintiff ISRAEL FARKASH, and business belonging to Plaintiff ISRAEL FARKASH, as well as to unjustly enrich himself and the other defendants herein.

117.   Defendant SHIMON DAVID DAVIDOVIZ, 38775268 DOB 09/18/1983 As

detailed hereinabove is named herein as a party defendant for damages and injuries caused to Plaintiff ISRAEL FARKASH by his continuous commission of fraudulent acts and promoting racketeering crimes, resulting in a pattern of racketeering activity as defined in 18 United States Code §1962; and falling within the parameters of the prohibited activities proscribed by 18 United States Code §1961, including, but not limited to, the sever beating by Shimon David Davidoviz that took place on April or May 2009, mail fraud, wire fraud, death threats, extortion, transportation of goods in interstate and foreign commerce that were knowingly obtained by means of false or fraudulent pretenses and representations, and having derived income directly from a pattern of racketeering activity in violation of 18 USC §1962, while acting on behalf of himself and while acting in concert with other defendants herein, and with the intent of causing, and having directly caused, damage and loss to property of Plaintiff ISRAEL FARKASH, and business belonging to Plaintiff ISRAEL FARKASH, as well as to unjustly enrich himself and the other defendants herein.

118. Defendant FRIDA DAVIDOVIZ is the wife of defendant SHIMON DAVID DAVIDOVIZ and his partner in crime to cover up their fraudulent scheme as detailed hereinabove both together made extensive plans effectuating the intended scheme with AHRON MORDECHI GLAUBER, and with the business G&G QUALITY CLOTHING INC., See **Exhibits "F"** attached hereto and incorporated herein as a part of this complaint, is a party defendant for damages and injuries caused to Plaintiff ISRAEL FARKASH by her continuous commission of fraudulent acts and promoting racketeering crimes, resulting in a

pattern of racketeering activity as defined in 18 United States Code §1962; and falling within the parameters of the prohibited activities proscribed by 18 United States Code §1961, including, but not limited to, mail fraud, wire fraud; death threats, extortion, transportation of goods in interstate and foreign commerce that were knowingly obtained by means of false or fraudulent pretenses and representations, and having derived income directly from a pattern of racketeering activity in violation of 18 USC §1962, while acting on behalf of herself and while acting in concert with other defendants herein, and with the intent of causing, and having directly caused, damage and loss to property of Plaintiff ISRAEL FARKASH, and business belonging to Plaintiff ISRAEL FARKASH, as well as to unjustly enrich himself and the other defendants herein.

119.   Defendant NUCHEM WELTZ, On December, 2016 NUCHEM WELTZ called and communicated with Berel Daskal for victimization, and extortionis is named herein as a party defendant for damages and injuries caused to Plaintiff ISRAEL FARKASH by his continuous commission of fraudulent acts and promoting racketeering crimes, resulting in a pattern of racketeering activity as defined in 18 United States Code §1962; and falling within the parameters of the prohibited activities proscribed by 18 United States Code §1961, including, but not limited to, mail fraud, wire fraud, death threats, extortion, transportation of goods in interstate and foreign commerce that were knowingly obtained by means of false or fraudulent pretenses and representations, and having derived income directly from a pattern of racketeering activity in violation of 18 USC §1962, while acting on behalf of himself and while acting in concert with other defendants herein, and

with the intent of causing, and having directly caused, damage and loss to property of Plaintiff ISRAEL  FARKASH, and business belonging to Plaintiff ISRAEL   FARKASH, as well as to unjustly enrich himself and the other defendants herein.

120.   Defendant EIZIK BRAUN,   had participated with AHRON MORDECHI GLAUBER, preparing the document, in which Daskal is to admit he is the owner of Hamerkaz is named herein as a party defendant for damages and injuries caused to Plaintiff ISRAEL  FARKASH by his continuous commission of fraudulent acts and promoting  racketeering crimes, resulting in a pattern of racketeering activity as defined in 18 United States Code §1962; and falling within the parameters of the prohibited activities proscribed by 18 United States Code §1961, including, but not limited to, mail fraud, wire fraud, death threats, extortion, transportation of goods in interstate and foreign commerce that were knowingly obtained by means of false or fraudulent pretenses and representations, and having derived income directly from a pattern of racketeering activity in violation of 18 USC §1962, while acting on behalf of himself and while acting in concert with other defendants herein, and with the intent of causing, and having directly caused, damage and loss to property of Plaintiff ISRAEL  FARKASH, and business belonging to Plaintiff  ISRAEL  FARKASH, as well as to unjustly enrich himself and the other defendants herein.

121.   Defendant  DOV PINCHAS SEGALis named herein as a party defendant for damages and injuries caused to Plaintiff ISRAEL  FARKASH, DOV PINCHAS SEGALis a person who is licensed to represent in rabbinical arbitration court in

the state of Israel

122. Defendant DOV PINCHAS SEGALwas retained by the Eisdorfer couple to represent them in rabbinical arbitration court in the state of Israel, thereafter DOV PINCHAS SEGALplaned and managed the bankruptcy case against, Daskal, and the company (Daskal Hamerkaz L 'Halbasha Americait) which was filed by the Eisdorfer couple, thereafter In the course of his fraudulent managing said bankruptcy, an application was submitted by the bankruptcy court (34) against the attorney Andy Schwartz for the disclosure of documents, said application was based largely on 19. DOV PINCHAS SEGALs fraudulent findings, the attorney Andy Schwartz In his response to the bankruptcy court he made serious accusations against the Eisdorfer couple in their bankruptcy case, such as money laundering in violation of USA law A copy of the pages of the Document that sets forth these facts is annexed hereto as **Exhibit " G."**

123. Despite that the couple who were party to the procedure who initiated it, did not respond to the allegations and did not deny them, de facto, which leads us to the conclusion that this is an admission of the facts they committed money laundering this now prevents them from denying this fact because they allegedly admitted it already in the bankruptcy proceedings they initiated against Mr. Daskal and the company (Daskal Hamerkaz L 'Halbasha Americait).

124. Defendant DOV PINCHAS SEGALis named herein as a party defendant for damages and injuries caused to Plaintiff ISRAEL FARKASH, including but not limited to, by its judicial misconduct relating to its orchestrating and committing

in concert with KALMAN EISDORFER, RACHEL EISDORFER, AHRON MORDECHI GLAUBER, G&G QUALITY CLOTHING INC., FILLMORE CT INC.,   SHIMON DAVID DAVIDOVIZ,   EIZIK BRAUN, and other defendants herein, RICO predicate acts, resulting in a pattern of  racketeering activity as defined in 18 United States Code §1962; and falling within the parameters of the prohibited activities proscribed by 18 United States Code §1961, including but not limited to,  including, but not  limited to,  had  participate  with  AHRON MORDECHI GLAUBER,  preparing the fraudulent document, in which Daskal is to admit he is the owner of Hamerkaz; mail fraud; wire fraud , death threats, extortion, in addition to aiding and abetting other herein defendants while acting on behalf of itself and in concert with other defendants herein, and with the intent of causing, and having caused as a result of the aforesaid RICO predicate acts damage and loss to property belonging to Plaintiff  ISRAEL  FARKASH, as well as to unjustly enrich itself.

## FIRST CLAIM FOR RELIEF
### (Violations of RICO, 18 U.S.C. § 1962(c))
### Against All Defendants

125. Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

126. Section 1962(c) prohibits a person from conducting the affairs of an enterprise through a pattern of racketeering.

127. At all relevant times, each Defendant is a person within the meaning of 18 U.S.C. 1961(3) and 1962(c).

128.   Each Plaintiff is a person within the meaning of 18 U.S.C. § 1964(c).

129.   Each and every Defendant is a person capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).

130.   Because of each and every Defendants' violations of RICO, Plaintiffs were financially injured as a result to their business and/or property.

131.   Each and every Defendant violated 18 U.S.C. § 1962(c) by the acts described in the prior paragraphs, and as further described below.

**The Rico Enterprise**

132.   The Defendants and their co-conspirators are a group of "persons" associated together in fact for the common purpose of carrying out an ongoing criminal enterprise, as described in the foregoing paragraphs of this Complaint. These Defendants form this association in fact for the common and continuing purpose described herein and constitute an enterprise within the meaning of 18 U.S.C. § 1961(4) engaged in the conduct of their affairs through a continuing pattern of racketeering activity. Each of the Defendants participated in the operation of or management of the enterprise. The members of the enterprise functioned as a continuing unit with an ascertainable structure separate and distinct from that of the conduct of the pattern of racketeering activity. There may be other members of the enterprise who are unknown as this time, but which will be uncovered during discovery.

133.   At all material times, the enterprise has engaged in, and their activities have affected, interstate and foreign commerce within the meaning of 18 U.S.C. § 1962(c).

**Pattern of Racketeering Activity In General**

134.   Defendants, each of whom are persons associated with, or employed by, the enterprise, did knowingly, willfully and unlawfully conduct or

participate, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1), 1961(5), and 1962(c).

135.    The racketeering activity, through the use of the interstate mails and wires, was made possible by Defendants' regular and repeated use of the services of the enterprise.Defendants had the specific intent to engage in the substantive RICO violations alleged herein.

136.    Predicate acts of racketeering activity are acts which are indictable under provisions of U.S.C. § 1961(1)(B). Defendants each committed at least two such acts or else aided and abetted such acts.

137.    The acts of racketeering were not isolated, but rather the acts of Defendants were related in that they had the same or similar purpose and result, participants, victims and method of commission. Further, the acts of racketeering by Defendants have been continuous. There was repeated conduct during a period of time   within the last ten years, and continuing to the present, and there is a continued threat of repetition of such conduct.

138.    As a direct and proximate result of each and every Defendants' RICO violations, the acts of racketeering activity of the enterprise, the overt acts taken in furtherance of those violations, and violations of 18 U.S.C. § 1962(a), (b), (c), and (d), each and every Plaintiff has been injured financially and individually in their business and property, including damage to Plaintiffs' reputations and good will jointly and severally, and other damage to their

business and/or property.

**Predicate Act: Transport and Receipt of Money in Violation of 18 U.S.C. § 2314**

139.   Defendants, each and every one of them acting individually and in concert, committed acts constituting indictable offense under 18 U.S.C. § 2314 in that having devised or intended to devise a scheme or artifice to defraud Plaintiffs, and the general public and/or to obtain money from Plaintiffs by means of false or fraudulent pretenses, representations or promises, Defendants transported or caused to be transported in interstate or foreign commerce money having a value of $5,000 or more, which was converted or taken by fraud as alleged herein.

**Predicate Act: Transport and Receipt of Money in Violation of 18 U.S.C. § 2315**

140.   Defendants, each and every one of them acting individually and in concert, committed acts constituting indictable offenses under 18 U.S.C.§ 2315 in that they received money in excess of $5,000, which crossed State or United States boundary after being unlawfully converted or taken. The acts of Defendants were done willfully and with the knowledge that the money was converted or taken by fraud. These acts were done intentionally and knowingly with the specific intent to advance Defendants' scheme or artifice.

**Pattern of Racketeering Activity and Continuity of Conduct**

141.   Defendants' violations of 18 U.S.C. §§ 1962(a), (b), (c), (d), 18 U.S.C. §§ 1341, 1343, 1956(a)(2), 2314, and 2315 constitute a "pattern of racketeering activity," as that term is defined in Section 1961(1) and (5) of RICO, because the acts were related to each other and had continuity. As alleged herein,

Defendants' violations of these statutes had the same or similar purposes, results, participants, victims, or methods of commission; they were interrelated and not isolated events.

### Continuity of Conduct

142.     Defendants' violations of these laws as set forth herein, each of which directly

and proximately injured Plaintiffs and others, constituted a continuous course of conduct

143.     These acts were intended to obtain money through false representations, fraud, deceit, and other improper and unlawful means. Therefore, violations were a part of a pattern of racketeering activity under 18 U.S.C. §§ 1961(1) and (5).

144.     On information and belief, Defendants have conducted and/or participated, directly and/or indirectly, in the conduct of the affairs of the alleged enterprises through a pattern of racketeering activity as defined herein in violation of 18 U.S.C. § 1962(c).

145.     The unlawful actions of Defendants, each of them, have directly, illegally, and proximately caused and continue to cause injuries to Plaintiffs in their business and property.

146.     As a direct and proximate result of each and every Defendants' RICO violations, the acts of racketeering activity of the enterprise, the overt acts taken in furtherance of those violations, and violations of 18 U.S.C. § 1962(a), (b), (c), and (d), each and every Plaintiff has been financially injured in their business and property, including damage to Plaintiffs' reputations and good will  and other

damage to their business and/or property.

147.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble damages  plus costs and attorneys' fees from each and every Defendant, Plaintiffs respectfully request that this Court enter judgment against Defendants in a sum of 10,000,000.00 , for costs herein incurred, for attorneys' fees, and for such other and further relief as this Court deems just and proper.

148.

## SECOND  CLAIM FOR RELIEF
### (Violations of RICO, 18 U.S.C. § 1962(d))
### Against All Defendants

149.    Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.
Section 1962(d) prohibits a person from conspiring to violate 18 U.S.C. §§ 1962(b), and (c).

150.    Each and every Defendant has unlawfully, knowingly, and willfully combined, conspired, confederated and agreed together and with others to violate 18 U.S.C. § 1962(b) and as described above, in violation of 18 U.S.C. § 1962(d).

151.    Upon information and belief, each and every Defendant knew that they were engaged in a conspiracy to commit the predicate acts, and they knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(b), and (c), in violation of 18 U.S.C. § 1962(d).

152.    Upon information and belief, each and every Defendant agreed to conduct or participate, directly or indirectly, in the conduct, management, or operation of the enterprise's

affairs through a pattern of racketeering activity in violation of 18 U.S.C. 1962(b), and (c).

153.    This intentional conduct, through a pattern of racketeering activity, includes:

     (a)    Multiple instances of mail fraud in violation of 18 U.S.C. § 1341

     (b)    Multiple instances of wire fraud in violation of 18 U.S.C. § 1343

     (c)    Multiple instances of money laundering in violation of 18 U.S.C. § 1956

     (d)    Multiple instances of transporting and receiving money in violation of 18 U.S.C. §§ 2314 and 2315.

154.    Each and every Defendant knew about and agreed to facilitate the enterprise's scheme to defraud the American public, Plaintiffs, and Congress. It was part of the conspiracy that each and every Defendant and their co-conspirators would commit a pattern of racketeering activity in the conduct of the affairs of the Enterprise, including the acts of racketeering set forth herein.

155.    As a direct and proximate result of each and every Defendants' conspiracy, the

acts of racketeering activity of the enterprise, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), each and every Plaintiff has been financially injured in their business and property, including

damage to Plaintiffs' reputations and good will; the impairment of Plaintiffs' interest in obtaining work, enormous medical expenses, and other damage to their business and/or property.

156.    Pursuant to 18 U.S.C. § 1964(d), Plaintiffs are entitled to recover treble damages  plus costs and attorneys' fees from each and every Defendant, Plaintiffs respectfully request that this Court enter judgment against Defendants in a sum of **10,000,000.00** , for costs herein incurred, for attorneys' fees, and for such other and further relief as this Court deems just and proper.

157.    attorneys' fees from each and every Defendant.

## THIRD  CLAIM FOR RELIEF
### (Unjust enrichment)

158.    Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full

159.    Defendants  FIVE STAR TRAVEL INC., KALMAN EISDORFER, RACHEL EISDORFER, AHRON MORDECHI GLAUBER a/k/a AHRON MORDEHAI FRIEDMAN, YONAH GLAUBER, G&G QUALITY CLOTHING INC., FILLMORE CT INC., J.T. Ruhaipari Vámszabadterületi Korlátolt Felelősségű Társaság, ELUZER HORVITZ, SHULEM HOROWITZ, SHIMON DAVID DAVIDOVIZ, FRIDA DAVIDOVIZ, NUCHEM WELTZ, EIZIK BRAUN, DOV PINCHAS SEGAL, acting in concert and conspiracy, by reason of the foregoing activities, were unjustly enriched.

## FOURTH  CLAIM FOR RELIEF

160.  Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full

161.  As a result of the fraud committed by the Defendants  FIVE STAR TRAVEL INC., KALMAN EISDORFER, RACHEL EISDORFER, AHRON MORDECHI GLAUBER a/k/a AHRON MORDEHAI FRIEDMAN, YONAH GLAUBER, G&G QUALITY CLOTHING INC., FILLMORE CT INC., J.T. Ruhaipari Vámszabadterületi Korlátolt Felelősségű Társaság, ELUZER HORVITZ, SHULEM HOROWITZ, SHIMON DAVID DAVIDOVIZ, FRIDA DAVIDOVIZ, NUCHEM WELTZ, EIZIK BRAUN, DOV PINCHAS SEGAL, against the plaintiffs herein, the plaintiffs have been damaged.

## PRAYER FOR RELIEF

162.  That this Court liberally construe the RICO laws and thereby find that all Defendants have associated with a RICO enterprise of persons and of other individuals who were associated in fact, all of whom engaged in, and whose activities did affect, interstate and foreign commerce in violation of the RICO laws U. S. C. 1962(c) (Prohibited activities).

163.  That this Court liberally construe the RICO  laws and  thereby find that all Defendants have conducted and/or participated, directly or indirectly, in the affairs of said RICO enterprise through a pattern ofracketeering activity in violation of the RICO laws at 18 U.S.C. §§ 1961(5) ("pattern" defined) and 1962(c) supra.

164. That all Defendants and all of their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from associating with any RICO enterprise of persons, or of other individuals associated in fact, who do engage in, or whose activities do affect, interstate and foreign commerce.

165. That all Defendants and all of their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from conducting or participating, either directly or indirectly, in the conduct of the affairs of any RICO enterprise through a pattern of racketeering activity in violation of the RICO laws at 18 U.S.C. §§ 1961(5) and 1962(c) supra.

166. That all Defendants and all of their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from committing any more predicate acts in furtherance of the RICO enterprise alleged in COUNT I supra.

167. That all Defeants be required to account for all gains, profits, and advantages derived from their several acts of racketeering in violation of 18 U. S. C. 1962(c) supra and from all other violation(s) of applicable Federal,State and federal law(s).

168.   That judgment be entered for Plaintiff and against all Defendants for Plaintiff's actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U. S. C. l962(c) supra, according to the best available proof.

169.   That all Defendants pay to Plaintiff's treble (triple) damages, under authority of 18 U. S. C. 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U. S. C. 1962(c) supra, according to the best available proof.

170.   That all Defendants pay to Plaintiff all damages sustained by Plaint-iff•i-n consequence of Defendants' several violations of  18 U. S. C. 1962(c) supra, according to the best   available proof. That all Defendants pay to Plaintiff's costs of the lawsuit incurred herein including, but not limited to, all necessary research, all non-judicial enforcement and all reasonable counsel's fees.

171.   That all damages caused by all Defendants, and all gains, profits, and advantages

172.   derived by all Defendants, from their several acts of racketeering in violation of 18 U. S. C. 1962(c) supra and from all other violation(s) of applicable Federal, State and federal law(s), be deemed to be held in constructive trust, legally foreign with respect to the federal zone [sic], for the benefit of Plaintiff, Her heirs and assigns.

173.   That Plaintiff have such other and further relief as this Court deems just and proper, under the full range of relevant circumstances which have occasioned the instant action

W H E R E F O R E, Plaintiffs pray that this Honorable Court will grant judgment against defendants and in favor of Plaintiffs, as follows:

(a) On the first cause of action, to issue a judgment in the amount of $10,000,000.00;

(b) On the second cause of action, to issue a judgment in the amount of $10,000,000.00;

(c) On the third cause of action, to issue a judgment in the amount of $10,000,000.00;

(d) on the fourth cause of action, to issue a judgment in the amount of $10,000,000.00;

161.   That Plaintiff have such other and further relief as this Court deems just and proper, under the full range of relevant circumstances which have occasioned the instant action

DATED: BROOKLYN, NEW YORK
April 25, 2018


ISRAEL FARKASH
Plaintiff Appearing Pro Se
4118  14th  Ave,  suite  40
Brooklyn NY 11219
(718) 8661991



After contact the side ends.

## JT Clothing Bonded Area LTD. / 1991
7561 Nagybajom, Zrinyi u 5o

VAT NUMBER: **10588738-2-14**   COMPANY REGISTRATION NUMBER: **14-09-002099**   SALES: **5.22 million.**   LAST SHEET: **2015**
NUMBER OF EMPLOYEES: **259**

PHONE: **82556960**   E-MAIL: **info@jtfactory.hu**

 IT WORKS FINE

## MEPs

| officers name | Post held | signatory | beginning Position | end function |
|---|---|---|---|---|
| Jusztusz Jakab first Managing | | | 07/21/1991 | 05/15/1995 |
| Jusztusz Jakab first Managing | | | 07/21/1991 | 05/15/1995 |
| Jusztusz Jakab first Managing | | | 07/21/1991 | 05/15/1995 |
| Lempel József | managing director (chief executive officer) | | 2012/05/24 | 05/24/2017 |
| Dömötör Sándorné | managing director (chief executive officer) | | 2012/05/24 | 05/24/2017 |
| Lempel József | managing director (chief executive officer) | | 2012/05/24 | 05/24/2017 |
| Dömötör Sándorné | managing director (chief executive officer) | | 2012/05/24 | 05/24/2017 |
| Dömötör Sándorné | managing director (chief executive officer) | | 2012/05/24 | 05/24/2017 |
| Lempel József | managing director (chief executive officer) | | 2012/05/24 | 05/24/2017 |
| Jusztusz Jakab | managing director (chief executive officer) | independent | | 2012/05/24 |
| Dömötör Sándorné | managing director (chief executive officer) | | | 2012/05/24 |
| Jusztusz Jakab | managing director (chief executive officer) | independent | | 2012/05/24 |
| Jusztusz Jakab | managing director (chief executive officer) | independent | | 2012/05/24 |
| Dömötör Sándorné | managing director (chief executive officer) | | | 2012/05/24 |
| Dömötör Sándorné | managing director (chief executive officer) | | | 2012/05/24 |
| Jacob Friedman | managing director (chief executive officer) | | 2011/08/29 | 2012/03/28 |
| Jacob Friedman | managing director (chief executive officer) | | 2011/08/29 | 2012/03/28 |
| Jacob Friedman | managing director (chief executive officer) | | 2011/08/29 | 2012/03/28 |
| Jusztusz Jakab | managing director (chief executive officer) | | 08/03/2011 | 2012/03/28 |
| Jusztusz Jakab | managing director (chief executive officer) | | 08/03/2011 | 2012/03/28 |
| Jusztusz Jakab | managing director (chief executive officer) | | 08/03/2011 | 2012/03/28 |
| Isaac Perlmutter | executive officer (uncredited) | | 08/03/2011 | 2011/08/29 |
| Isaac Perlmutter | executive officer (uncredited) | | 08/03/2011 | 2011/08/29 |
| Isaac Perlmutter | executive officer (uncredited) | | 08/03/2011 | 2011/08/29 |
| Jusztusz Jakab | executive officer (uncredited) | independent | 05/01/2011 | 08/03/2011 |
| Jusztusz Jakab | executive officer (uncredited) | independent | 05/01/2011 | 08/03/2011 |
| Jusztusz Jakab | executive officer (uncredited) | independent | 05/01/2011 | 08/03/2011 |

| | | | | |
|---|---|---|---|---|
| Jusztusz Jakab | executive officer (uncredited) | independent | 2008/06/10 | 05/01/2011 |
| Jusztusz Jakab | executive officer (uncredited) | independent | 2008/06/10 | 05/01/2011 |
| Jusztusz Jakab | executive officer (uncredited) | independent | 2008/06/10 | 05/01/2011 |
| Jusztusz Jakab | manager | | 05/30/1995 | 2008/06/10 |
| Jusztusz Jakab | manager | | 05/30/1995 | 2008/06/10 |
| Jusztusz Jakab | manager | | 05/30/1995 | 2008/06/10 |

## Supervisory Board members

| officer's name | beginning Position | end function |
|---|---|---|
| Horváth Ferenc | | |
| Horváth Ferenc | | |
| Ruska László | | |
| Ruska László | | |
| Ruska László | | |
| White Répásiné Marianna | | |
| White Répásiné Marianna | | |
| Horváth Ferenc | | |
| White Répásiné Marianna | | |
| Dave Glauber | 07/21/1991 | 03/24/2001 |
| Dave Glauber | 07/21/1991 | 03/24/2001 |
| Dave Glauber | 07/21/1991 | 03/24/2001 |
| Asher Glauber | 07/21/1991 | 08/30/1999 |
| Asher Glauber | 07/21/1991 | 08/30/1999 |
| Asher Glauber | 07/21/1991 | 08/30/1999 |
| dr. Vámi János | 07/21/1991 | 07/16/1998 |
| dr. Vámi János | 07/21/1991 | 07/16/1998 |
| dr. Vámi János | 07/21/1991 | 07/16/1998 |
| Lempel József | 08/03/2011 | 08/27/2013 |
| Ahron Mordehai Glauber | 08/03/2011 | 08/27/2013 |
| Lempel József | 08/03/2011 | 08/27/2013 |
| Lempel József | 08/03/2011 | 08/27/2013 |
| Avrom R. Vann | 08/03/2011 | 08/27/2013 |
| Ahron Mordehai Glauber | 08/03/2011 | 08/27/2013 |
| Ahron Mordehai Glauber | 08/03/2011 | 08/27/2013 |
| Avrom R. Vann | 08/03/2011 | 08/27/2013 |
| Avrom R. Vann | 08/03/2011 | 08/27/2013 |
| Josef Beck | 23/11/2001 | 08/03/2011 |

| | | |
|---|---|---|
| Josef Beck | 23/11/2001 | 08/03/2011 |
| David Beck | 23/11/2001 | 08/03/2011 |
| Bernhard Karolnik | 23/11/2001 | 08/03/2011 |
| David Beck | 23/11/2001 | 08/03/2011 |
| Josef Beck | 23/11/2001 | 08/03/2011 |
| Bernhard Karolnik | 23/11/2001 | 08/03/2011 |
| David Beck | 23/11/2001 | 08/03/2011 |
| Bernhard Karolnik | 23/11/2001 | 08/03/2011 |
| Yonah Glauber | 03/24/2001 | 23/11/2001 |
| Yonah Glauber | 03/24/2001 | 23/11/2001 |
| Yonah Glauber | 03/24/2001 | 23/11/2001 |
| Baruch Glauber | 08/30/1999 | 23/11/2001 |
| Baruch Glauber | 08/30/1999 | 23/11/2001 |
| Baruch Glauber | 08/30/1999 | 23/11/2001 |
| Aron Glauber | 05/11/1994 | 23/11/2001 |
| Aron Glauber | 05/11/1994 | 23/11/2001 |
| Aron Glauber | 05/11/1994 | 23/11/2001 |

After contact the side ends.

## JT Clothing Bonded Area LTD.  /  1991

7561 Nagybajom, Zrinyi u 5o

VAT NUMBER: **10588738-2-14**   COMPANY REGISTRATION NUMBER: **14-09-002099**   SALES: **5.22 million.**   LAST SHEET: **2015**
NUMBER OF EMPLOYEES: **259**

PHONE: **82556960**   E-MAIL: **info@jtfactory.hu**



## MEPs

| officers name | Post held | signatory | beginning Position | end function |
|---|---|---|---|---|
| Jusztusz Jakab first Managing | | | 07/21/1991 | 05/15/1995 |
| Jusztusz Jakab first Managing | | | 07/21/1991 | 05/15/1995 |
| Jusztusz Jakab first Managing | | | 07/21/1991 | 05/15/1995 |
| Lempel József | managing director (chief executive officer) | | 2012/05/24 | 05/24/2017 |
| Dömötör Sándorné | managing director (chief executive officer) | | 2012/05/24 | 05/24/2017 |
| Lempel József | managing director (chief executive officer) | | 2012/05/24 | 05/24/2017 |
| Dömötör Sándorné | managing director (chief executive officer) | | 2012/05/24 | 05/24/2017 |
| Dömötör Sándorné | managing director (chief executive officer) | | 2012/05/24 | 05/24/2017 |
| Lempel József | managing director (chief executive officer) | | 2012/05/24 | 05/24/2017 |
| Jusztusz Jakab | managing director (chief executive officer) | independent | | 2012/05/24 |
| Dömötör Sándorné | managing director (chief executive officer) | | | 2012/05/24 |
| Jusztusz Jakab | managing director (chief executive officer) | independent | | 2012/05/24 |
| Jusztusz Jakab | managing director (chief executive officer) | independent | | 2012/05/24 |
| Dömötör Sándorné | managing director (chief executive officer) | | | 2012/05/24 |
| Dömötör Sándorné | managing director (chief executive officer) | | | 2012/05/24 |
| Jacob Friedman | managing director (chief executive officer) | | 2011/08/29 | 2012/03/28 |
| Jacob Friedman | managing director (chief executive officer) | | 2011/08/29 | 2012/03/28 |
| Jacob Friedman | managing director (chief executive officer) | | 2011/08/29 | 2012/03/28 |
| Jusztusz Jakab | managing director (chief executive officer) | | 08/03/2011 | 2012/03/28 |
| Jusztusz Jakab | managing director (chief executive officer) | | 08/03/2011 | 2012/03/28 |
| Jusztusz Jakab | managing director (chief executive officer) | | 08/03/2011 | 2012/03/28 |
| Isaac Perlmutter | executive officer (uncredited) | | 08/03/2011 | 2011/08/29 |
| Isaac Perlmutter | executive officer (uncredited) | | 08/03/2011 | 2011/08/29 |
| Isaac Perlmutter | executive officer (uncredited) | | 08/03/2011 | 2011/08/29 |
| Jusztusz Jakab | executive officer (uncredited) | independent | 05/01/2011 | 08/03/2011 |
| Jusztusz Jakab | executive officer (uncredited) | independent | 05/01/2011 | 08/03/2011 |
| Jusztusz Jakab | executive officer (uncredited) | independent | 05/01/2011 | 08/03/2011 |

| Jusztusz Jakab | executive officer (uncredited) | independent | 2008/06/10 | 05/01/2011 |
| Jusztusz Jakab | executive officer (uncredited) | independent | 2008/06/10 | 05/01/2011 |
| Jusztusz Jakab | executive officer (uncredited) | independent | 2008/06/10 | 05/01/2011 |
| Jusztusz Jakab | manager | | 05/30/1995 | 2008/06/10 |
| Jusztusz Jakab | manager | | 05/30/1995 | 2008/06/10 |
| Jusztusz Jakab | manager | | 05/30/1995 | 2008/06/10 |

## Supervisory Board members

| officer's name | beginning Position | end function |
|---|---|---|
| Horváth Ferenc | | |
| Horváth Ferenc | | |
| Ruska László | | |
| Ruska László | | |
| Ruska László | | |
| White Répásiné Marianna | | |
| White Répásiné Marianna | | |
| Horváth Ferenc | | |
| White Répásiné Marianna | | |
| Dave Glauber | 07/21/1991 | 03/24/2001 |
| Dave Glauber | 07/21/1991 | 03/24/2001 |
| Dave Glauber | 07/21/1991 | 03/24/2001 |
| Asher Glauber | 07/21/1991 | 08/30/1999 |
| Asher Glauber | 07/21/1991 | 08/30/1999 |
| Asher Glauber | 07/21/1991 | 08/30/1999 |
| dr. Vámi János | 07/21/1991 | 07/16/1998 |
| dr. Vámi János | 07/21/1991 | 07/16/1998 |
| dr. Vámi János | 07/21/1991 | 07/16/1998 |
| Lempel József | 08/03/2011 | 08/27/2013 |
| Ahron Mordehai Glauber | 08/03/2011 | 08/27/2013 |
| Lempel József | 08/03/2011 | 08/27/2013 |
| Lempel József | 08/03/2011 | 08/27/2013 |
| Avrom R. Vann | 08/03/2011 | 08/27/2013 |
| Ahron Mordehai Glauber | 08/03/2011 | 08/27/2013 |
| Ahron Mordehai Glauber | 08/03/2011 | 08/27/2013 |
| Avrom R. Vann | 08/03/2011 | 08/27/2013 |
| Avrom R. Vann | 08/03/2011 | 08/27/2013 |
| Josef Beck | 23/11/2001 | 08/03/2011 |

| | | |
|---|---|---|
| Josef Beck | 23/11/2001 | 08/03/2011 |
| David Beck | 23/11/2001 | 08/03/2011 |
| Bernhard Karolnik | 23/11/2001 | 08/03/2011 |
| David Beck | 23/11/2001 | 08/03/2011 |
| Josef Beck | 23/11/2001 | 08/03/2011 |
| Bernhard Karolnik | 23/11/2001 | 08/03/2011 |
| David Beck | 23/11/2001 | 08/03/2011 |
| Bernhard Karolnik | 23/11/2001 | 08/03/2011 |
| Yonah Glauber | 03/24/2001 | 23/11/2001 |
| Yonah Glauber | 03/24/2001 | 23/11/2001 |
| Yonah Glauber | 03/24/2001 | 23/11/2001 |
| Baruch Glauber | 08/30/1999 | 23/11/2001 |
| Baruch Glauber | 08/30/1999 | 23/11/2001 |
| Baruch Glauber | 08/30/1999 | 23/11/2001 |
| Aron Glauber | 05/11/1994 | 23/11/2001 |
| Aron Glauber | 05/11/1994 | 23/11/2001 |
| Aron Glauber | 05/11/1994 | 23/11/2001 |



Case 1:18-cv-02699-ALC   Document 1   Filed 04/26/18   Page 55 of 87

SUPREME COURT STATE OF NEW YORK
COUNTY OF QUEENS
-------------------------------------------------------------x

G & G QUALITY CLOTHING INC.,

                                    Plaintiff,

                  -against-

CHAIM STERN,

                                    Defendant.
-------------------------------------------------------------x

STATE OF NEW YORK )
                              ss.:
COUNTY OF QUEENS  )

Index No. 704751/2017

**AFFIDAVIT OF
CHAIM STERN**

CHAIM STERN, deposes and states as follows:

1.  I am the defendant in this action and make this affidavit in opposition to the motion for summary judgment in lieu of complaint of Plaintiff G & G Quality Clothing Inc. ("G&G"), and in support of my cross motion to dismiss.  This affidavit is not intended to detail every fact regarding my execution of the Guaranty and subsequent events, but only those facts relevant to this motion and cross-motion.  Except where otherwise stated, I have personal knowledge of the following facts.

2.  In or around February 2013, I was contacted to provide a guaranty to G&G on behalf of Daskal Hamerkaz L'Halbasha Americait ("Hamerkaz").  Although I was not connected to Hamerkaz, it is common in the Chassidic community to extend such courtesies upon request.

3.  After I was informed about the ownership and the business, I felt comfortable that both the owners and the business were financially stable, and I agreed to provide a guaranty to G&G.

4.   Annexed hereto as **Exhibit "A"** is a true and correct copy of the Guaranty signed on February 20, 2013.

5.   Around mid-August 2013, Mr. Aron Glauber, the principal of G&G, called me and said that Hamerkaz owed G&G hundreds of thousands of dollars, and that because Hamerkaz had failed to pay, I would have to pay under the guaranty.

6.   Mr. Glauber then provided me with instructions to make a wire transfer to one of G&G's suppliers in Japan for $87,187.35, and on or about August 22, 2013, I arranged for a wire transfer of $86,500 to Dygo Corporation through one of my business associates.  (This transfer has been confirmed to me by my business associate who made the wire transfer and has ordered a copy from his bank, which I can furnish the Court upon receipt).  Annexed hereto as **Exhibit "B"** is a true and correct copy of the instructions for the wire transfer I received from Mr. Glauber to Dygo Corporation.  I made this payment because I trusted Mr. Glauber when he represented to me that Hamerkaz owed a balance to G&G.

7.   I now know that Mr. Glauber's statements were false.  The ledger Hamerkaz (annexed as Exhibit "C" in the Affirmation of Bracha Ester Kauftheil), shows that their balance was only $112,050.42, which should have been reduced to about $25,550 as a result of my $86,500 payment to Dygo.

8.   Nevertheless, Mr. Glauber continued to represent to me that Hamerkaz had large debts owed to G&G, which at the time I had no reason to doubt, and as a result Mr. Glauber again instructed me to make a payment, this time to another company in China.

9.   Annexed hereto as **Exhibit "C"** is a true and correct copy of the email and wire instructions received from G&G instructing to pay $431,372.70, together with the wire

2

transfer confirmation. This payment was then made for $431,137.70 to one of G&G's suppliers in China, "Jiangsu Sunshine Garment Co., Ltd."

10.   Annexed hereto as **Exhibit "D"** is a true and correct copy of the email and wire instructions received from G&G, together with the wire transfer confirmation, which instructions I received on the same day as the Jiangsu instructions. These instructions directed payment G&G's supplier "Shaoxing Hengli Necktie & Fashion Co., Ltd." I made the requested payment in the amount of $110,000.

11.   Annexed hereto as **Exhibit "E"** is true and correct copy of another email received from G&G on September 16, 2013 with instructions from their Chinese supplier to send a letter from my bank to show the wire payments were intended for a certain account, since the prior wire instructions apparently had some sort of problem.

12.   As I later found out, Hamerkaz did not owe any of the sums which G&G represented to me, and that G&G never presented, nor demanded payment from Hamerkaz, during the times when they asked me for those payments. I also found out later that G&G did not credit, or even inform Hamerkaz of, the payments I made.

13.   Subsequently, Mr. Glauber contacted me in late February or early March of 2014, and told me yet again that G&G had a large open balance which was not being paid. He told me to expect instructions by email, as before, and on March 4, 2014, I received instructions from G&G to wire $121,002.44 to their supplier in Taiwan " China Comtex Enterprise Co., Ltd." I arranged for this payment to be made for $121,003. Annexed hereto as **Exhibit "F"** is true and correct copy of another email received from G&G on March 4, 2014 with instructions to pay their Taiwanese supplier, together with the wire details and confirmation.

3

14.   As I later found out, Hamerkaz did not owe any of the sums which G&G represented to me, and that G&G never presented, nor demanded payment from Hamerkaz, during the times when they asked me for those payments.  I also found out later that G&G did not credit, or even inform Hamerkaz of, the payments I made.

15.   During the summer of 2015, I was informed of certain wrongful acts which G&G directed at Merkaz and myself, including G&G's refusal to extend credit to Hamerkaz in 2013 as promised; improper meddling with the internal affairs of Hamerkaz; and the making certain fraudulent representations to me in connection with the execution of the Guaranty.

16.   As a result, I became extremely upset and called Mr. Glauber and left numerous messages.  He chose to ignore me.

17.   During the first week of October 2015, either right before or right after the religious holiday, I sent a message to Mr. Glauber through an intermediary in the Chassidic community, notifying him that I was terminating the Guaranty.

18.   During October 2015, I continued trying to contact Mr. Glauber about the termination of the Guaranty.  After not hearing back from Mr. Glauber despite repeated attempts, on or about October 25, 2015, I mailed Mr. Glauber a letter with notice that I was terminating the Guaranty.  A day or two after I sent the termination by mail, I followed up by sending an email to Mr. Glauber. I never received a response from anyone at G&G.

19.   Annexed hereto as **Exhibit "G"** are true and correct copies of the termination notice that I sent by mail, and the follow up email that I sent shortly thereafter.

4

20.   I have reviewed the invoices annexed to G&G's summary judgment motion.
G&G never provided me with notice that the goods for which these invoices were
purportedly submitted were prepared and are ready for shipment, or G&G had invoiced
Hamerkaz for such goods and had not received payment.

_____
Chaim Stern

Affirmed to before me this
25th day of July 2017

_____
Notary Public

JACOB BORENSTEIN
Notary Public, State of New York
No. 02BO4876330
Qualified in Queens County
Commission Expires October 20, 20 18

5



Case 1:18-cv-03699-ALC   Document 1   Filed 04/26/18   Page 61 of 87

SUPREME COURT STATE OF NEW YORK
COUNTY OF QUEENS

--------------------------------------------------------------x

G & G QUALITY CLOTHING INC.,

                            Plaintiff,

       -against-

CHAIM STERN,

                            Defendant.

--------------------------------------------------------------x

Index No. 704751/2017

**AFFIRMATION OF
BRACHA ESTER
KAUFTHEIL**

STATE OF ISRAEL     )
                         ss.:
DISTRICT OF TEL AVIV )

       BRACHA ESTER KAUFTHEIL, affirms the following under penalty of perjury

pursuant to CPLR 2106(b):

       1.   I make this affirmation in opposition to the motion for summary judgment in lieu

of complaint of Plaintiff G & G Quality Clothing Inc. ("G&G"), and in support of the cross-

motion to dismiss of Defendant Chaim Stern ("Stern"). Except where otherwise stated, I am

fully familiar with and have personal knowledge of the following facts.

       2.   I work for Daskal Hamerkaz L'Halbasha Americait ("Hamerkaz") as a full time

bookkeeper, and manage all of Hamerkaz's accounting and financial records. I have held

this position for the past eight years.

       3.    As part of my education, I studied accounting and received a degree in

accounting and bookkeeping. I perform my work responsibly and with the outmost integrity

to protect all accounts and records at Hamerkaz.

       4.   My job functions and responsibilities include handling all of the accounts payable

records, making payments, and recording all invoices and resulting payments. I manage all

wire transfers and other payment mechanisms. I also keep track of all activity on the

accounts payable.

5. As detailed in this affirmation, Hamerkaz owes G&G nothing under the invoices

annexed to G&G's motion (or under any other invoices). To the contrary, Hamerkaz has a

credit with G&G of at least $201,010.

### Background on Hamerkaz and G&G

6. Hamerkaz's main business is the retail of specialty men's garments in the

Chassidic community in Israel. Hamerkaz has been one of Israel's main retailers of Chassidic

garments for over twenty five years, and has also been the exclusive seller of G&G's brand

in Israel.

7. Hamerkaz has marketed the G&G brand under the combined name of Daskal and

G&G for many years, and this is how the brand is known in Israel. Hamerkaz had been

selling only the G&G brand until G&G stopped selling to Hamerkaz.

8. Hamerkaz and G&G have entered into various agreements over the years, some

written, but many oral. Much of the business has been conducted over the phone and in face

to face meetings, either at G&G's offices in Brooklyn, New York, or at the Hamerkaz offices

in Israel.

### G&G Demands that Hamerkaz Obtain a Guarantor

9. Throughout the many years that they did business together, G&G extended credit

to Hamerkaz with payment to be made on agreed upon terms.

10. However, during late 2012, due to circumstances that are beyond the scope of this

affidavit, but for which Mr. Aron Glauber, a principal of G&G, was responsible, Hamerkaz

was forced to make an unexpected payment of almost $900,000 in connection with an Israeli

bankruptcy proceeding.

2

11. As a result of unexpectedly having to pay almost $900,000 as a result of Mr. Glauber's conduct, Hamerkaz became unable to keep up with payments as before, and G&G requested that Hamerkaz confirm in writing that it would no longer buy on credit.

12. In January of 2013, Hamerkaz sent an email to G&G stating that it would no longer buy on credit, which was followed by a formal agreement signed by Hamerkaz and G&G on February 5, 2013. Another email was sent from Hamerkaz to G&G confirming the agreement on February 19, 2013.

13. Annexed hereto as **Exhibit "A"** is a true and correct copy of these two emails, and the formal agreement with G&G, together with a true certified translation from Hebrew to English.

14. During the same period, G&G demanded that Hamerkaz find a guarantor in the event that Hamerkaz was unable to make timely payments to G&G for current and future orders.

15. Hamerkaz, through the courtesy of Mr. Chaim Stern (who was not affiliated with Hamerkaz), was able to secure the guaranty for G&G, and on February 20, 2013, a guaranty document was executed between Mr. Stern and G&G. Annexed hereto as **Exhibit "B"** is a true and correct copy of the Guaranty.

### G&G Overbills Stern by $748,640.70 Under the Guaranty

16. As set forth above, G&G had in the month leading up to the execution of the Guaranty extracted an agreement from Hamerkaz to give up any credit extension (see Exhibit "A").

17. As reflected in Exhibit "A", the balance owed to G&G in February 2013 was $546,676.72, which would be paid in weekly installments of $20,000.

3

18.   Annexed hereto as **Exhibit "C"** is a true and correct copy of Hamerkaz's accounts payable ledger for G&G, which reflects the invoices from G&G and payments thereto.  The ledger annexed as Exhibit "C" was maintained by me in the ordinary course of business of Hamerkaz using Hamerkaz's regular bookkeeping procedures, and the entries were made at or around the time of the respective invoices and payments.

19.   This ledger contains a column in the middle of the page with a $ sign, and to the left of the $ sign is the current balance and constantly updated balance with G&G. The first column to the right of the $ sign reflects the new invoices for all merchandise from G&G, with the column to the right of that being the payments made by Hamerkaz to G&G.  The invoice numbers of G&G's invoices are also recorded to the right of the payment column, with the date of each transaction farther to the right of the page.  As is customary in Israel, the month is the middle figure in the dates.

20.   This ledger does not reflect, and its balance does not account for, certain payments made directly to G&G's suppliers in Asia or to G&G's attorney Mr. Vann in New York, all of which were made by wire transfer at the request of G&G, as detailed below.

21. As reflected in the ledger, after execution of the Guaranty in late February of 2013, G&G did not extend any credit to Hamerkaz until July 2013.  G&G's invoices were paid immediately when presented in accordance with the agreement of February 5, 2013, and as expressly requested by G&G.  (See Ex. A.)  Thus, for a period of nearly five and a half months, G&G did not extend credit to Hamerkaz.

22.   Thereafter, G&G did extend some credit, which Hamerkaz paid at regular intervals.  However, G&G was not pleased to extend credit, and would often threaten to stop doing business with us if we did not pay COD.

4

Case 1:18-cv-03699-ALC   Document 1   Filed 04/26/18   Page 65 of 87

23.   During the period from August 1, 2013 to August 27, 2013, Hamerkaz had a balance of $112,050.42 to G&G.

24.   As I later found out, in the days leading up to August 21, 2013, G&G demanded that Mr. Stern pay G&G hundreds of thousands of dollars that G&G claimed Hamerkaz owed, even though the actual balance was only $112,050.42.  G&G also had not demanded any payment from Hamerkaz during that month.

25.   Without the knowledge of anyone at Hamerkaz, I am informed that at the request of G&G, Mr. Stern wired $86,500 to a company named Dygo located in Japan, which is one of G&G's suppliers.

26.   Thereafter, G&G never informed Hamerkaz of the payment made by Mr. Stern, nor did it ever credit us for any such amount.

27.   On or about September 9, 2013, the balance due to G&G by Hamerkaz was $156,730.22 (not accounting for the payment by Mr. Stern).  G&G did not demand payment at that time from Hamerkaz.

28.   To our surprise, we later learned that G&G had again demanded that Mr. Stern pay another $431,137.70 to one of G&G's suppliers in China, Jiangsu Sunshine Garment Co., Ltd.  Over the years, G&G had similarly requested that Hamerkaz pay that same company directly on account of G&G, as set forth further below.

29.   On the same day, and as Hamerkaz later discovered, G&G demanded yet another $110,000 from Mr. Stern, and directed him to pay yet another of G&G's Chinese suppliers (Shaoxing Hengli Necktie & Fashion Co., Ltd.), purportedly on account of Hamerkaz's balance to G&G.

5

Case 1:18-cv-03699-ALC   Document 1   Filed 04/26/18   Page 66 of 87

30.   Again, G&G never informed Hamerkaz that Mr. Stern paid the aforesaid sums for the benefit of Hamerkaz, and Hamerkaz never received credit for these payments from G&G.

31.   Between January 1 and March 10, 2014, Hamerkaz had a positive balance with G&G, with a positive credit balance at times over $100,000.

32.   As Hamerkaz later found out, G&G, despite not being owed anything by Hamerkaz, again demanded that Mr. Stern pay yet another $121,003, falsely claiming that Hamerkaz had a past due balance which it failed to pay.

33.   Mr. Stern did not question G&G's representation and wired the requested payment to one of G&G suppliers in China, Comtex Enterprise Co., Ltd.

34.   As with the previous payments made by Mr. Stern, G&G did not apprise Hamerkaz of this payment, and Hamerkaz never received any credit for this payment.

**The Invoices Annexed to Plaintiff's Motion Are Not Due and Owing**

35.   I have reviewed the invoices annexed to G&G's motion for summary judgment. These consist of five invoices totaling $845,224.59 for goods that have allegedly been shipped to Hamerkaz, and one "pro forma" invoice for Passover 2017.  As explained next, none of these invoices is due and owing.

36.   On or about March 2, 2015, Hamerkaz entered into an agreement with G&G to make all payments according to a certain monthly schedule which would add up to $1,900,000 annually.

37.   Annexed hereto as **Exhibit "D"** is a true and correct copy of the aforesaid 2015 agreement together with the payment schedule, with a certified translation.

38.   Under this agreement, Hamerkaz's fixed monthly payments would cover the outstanding balance as of March 2015 (which balance did not reflect the payments made by

6

Stern that G&G failed to disclose or credit), and would also cover all new invoices for new merchandise.

39.  In other words, it was agreed that G&G would not demand payment for any invoices, and instead would receive the fixed monthly payments as per the agreed schedule for the following twelve months.

40.  The aforementioned payments included two wire payments to G&G's attorney, Mr. Vann, in April and May of 2016, at the request of G&G.

41.  Annexed hereto as **Exhibit "E"** are true and correct copies of two wire transfers paid directly to G&G's attorney, Mr. Avrom Vann, on about April 21, 2015, and May 5, 2015 at the request of G&G.  The payments total $200,000.

42.  Annexed hereto as **Exhibit "F"** is a true and correct copy of an email and certified translation from G&G directing payment to Mr. Vann, with the wire confirmations.

43.  Annexed hereto as **Exhibit "G"** are true and correct copies of a ledger of the wire transfer payments to Jiangsu Sunshine Garment Co. Ltd, ("Sunshine"), a G&G supplier, together with the wire transfer confirmations.  (There was one transfer confirmation in the amount of $48,000 that I was unable to find, but this transfer has been confirmed to me by the bank and I have ordered another copy from the bank, which I can furnish the Court upon receipt.)  The exhibit also includes confirmation of a payment of $11,000 to Shandong Companion Group ("Shandong") in China, another G&G supplier.  Hamerkaz made these payments by wire transfer to Sunshine and Shandong at the request of G&G, to be applied as a credit on the Hamerkaz balances.

44.  G&G never credited Hamerkaz for any of the aforementioned payments that G&G directed Hamerkaz to make to third parties.

7

45. In addition, Hamerkaz has repeatedly requested that G&G credit Hamerkaz for damaged goods, but G&G has failed to provide the credits to which Hamerkaz is entitled. In 2013 and 2014, as well as years prior, G&G had shipped merchandise that Hamerkaz had not ordered, including, for instance, mismatched colors that rendered the garments unsellable, wrong items that had not been ordered, and damaged items that could not be sold.

46. As of 2015, Hamerkaz had processed damaged and non-sellable merchandise received from G&G over recent years that was worth in excess of $3 million. However, despite repeated pleas and requests, G&G refused to accept the return of the items or provide a credit.

47. As a result of receiving all of this damaged and defective merchandise, Hamerkaz requested that G&G allow Hamerkaz to send personnel to the JT Clothing factory in Budapest, Hungary (JT is a G&G subsidiary or affiliated company) in order to ascertain whether the merchandise was exactly as ordered, and to inspect for quality, quantity and damage.

48. I was informed that the Manager for JT Clothing in Hungary would come to Israel to discuss. The details of this visit are described in an affirmation by Gedalyeh Ealson, an expert retained by Hamerkaz. As explained by Mr. Ealson, G&G refused to allow Hamerkaz to travel to G&G's factory in Hungary to inspect the merchandise to be shipped. As a result, I was unable to correct the losses and incorrect balances on the G&G accounts payable records, which would have otherwise been reduced by more than $3 million.

49. As a result of the damaged and defective goods, Hamerkaz should have received a credit in excess of $3 million dollars by 2015. But Hamerkaz has received no such credit.

50. The balance showing as due to G&G on Hamerkaz's ledger in early October 2015 was $183,629. However, this figure did not account for the $200,000 paid to Mr. Vann,

8

nor the $448,000 paid to Sunshine or the $110,000 paid to Shandong. It also did not account for any of the defective, damaged, mismatched or wrong and non-ordered merchandise that G&G has failed to credit back to Hamerkaz. But even without crediting the defective merchandise, Hamerkaz had a positive credit balance as a result of the Vann, Shandong, and Sunshine payments.

51. The agreement to pay fixed monthly sums was thereafter extended orally at the request of G&G. This oral extension is evidenced by emails from G&G. Annexed hereto as **Exhibit "H"** are true and correct copies of two emails and attachments regarding the scheduled payments, together with certified translations. In 2016, Hamerkaz continued to make the scheduled payments, as we did in 2015, and on the same terms and schedule. This continued through February 2017, when Hamerkaz stopped making payments to G&G.

52. During 2016, Hamerkaz continued to make the regular scheduled payments as agreed. G&G never demanded any other payments during 2015 or 2016, until November of 2016.

53. By mid-November 2016, Hamerkaz's ledger showed a balance of $1,507,989.11. However, due to additional payments to G&G's designees, the true balance owing to G&G was only $159,989.11, excluding the defective merchandise credits that G&G failed to provide. As reflected in Exhibit H, Hamerkaz had already made wire payments totaling $1,159,000 to Jiangsu Sunshine Garment Co. in China, and Shandong suppliers of G&G. Annexed hereto as **Exhibit "I"** are true copies of email examples and certified translations of same that show G&G instructing Hamerkaz to remit payments to these companies in China, and also show Hamerkaz asking for confirmation of these third party payments for bookkeeping and tax purposes, a request that G&G repeatedly ignored.

9

54. These payments to China were always requested by G&G first over the phone or in person, followed by email instructions of where to send the wire.

55. Hamerkaz made all of the fixed payments contemplated by the agreed upon schedule, and between December 2016 and February 2, 2017, Hamerkaz made three more payments directly to G&G totaling $350,000. As a result of these and the third party payments set-forth hereinabove, as of February 2017 Hamerkaz had overpaid G&G by at least $201,010, which sum does *not* include the credits to which Hamerkaz is entitled for damaged and defective merchandise.

56. I am informed that by October 2016, G&G had shipped another $897,000 in defective and damaged goods, in addition to those mentioned above, none of which has been credited to Hamerkaz.

57. G&G has never requested that Hamerkaz pay any of the invoices annexed to Mr. Glauber's summary judgment affidavit. In fact, in 2015 and 2016, G&G did not request a single payment outside of the agreed payment schedule discussed above.

58. G&G never presented a single invoice for fabric and trim to Hamerkaz during either 2016 or 2017, let alone demand any payment for same.

59. Hamerkaz did not receive the goods reflected in the "pro forma" invoice for Passover 2017. Although Hamerkaz wanted to purchase these goods, G&G refused to sell them to Hamerkaz. G&G informed us that it would no longer sell any product to Hamerkaz. Further, not only was such a "pro forma" invoice never presented to us, nothing like it was ever presented throughout Hamerkaz's 25 years of dealings with G&G.

60. Annexed hereto as **Exhibit "J"** is a letter that Hamerkaz received on or about January 19, 2017 from Mr. Aron Glauber. Mr. Glauber's letter states on page 2 that the Passover and Rosh Hashanah garment were not ready to be shipped, and that G&G will

10

notify us when they are ready. This directly contradicts the assertion in the December 2016 demand letter that payment for the Passover and Rosh Hashanah garments was then due and owing because the garments were purportedly ready for shipment.

61. I affirm this 24th day of July, 2017, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that I am physically located outside the geographic boundaries of the United States, Puerto Rico, the United States Virgin Islands, or any territory or insular possession subject to the jurisdiction of the United States, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

Dated: Bnei Brak, Israel
July 24, 2017

Bracha Ester Kauftheil

11



ישראל פרקש &lt;farkashbiz@gmail.com&gt;

# M Gmail

## Fwd:

ברוכי | דסקל - המרכז להלבשה אמריקאית בע"מ &lt;bruchi@ddaskal.com&gt;
אל: ישראל פרקש &lt;Israel@ifarkash.com&gt;

25 באפריל 2018 בשעה 12:12

שלום ישראל, זה האימייל שקיבלנו בזמנו מגלובעּר ושלום הורוביץ. בזמנו גלובעּר לחץ עלינו להעביר את הכסף מהר לעו"ד אברהם וואן כי הוא צריך לשלם את זה לרשויות המס האמריקאיות במסגרת ההסכם שהוא עשה על הכסף השחור שלהם בשווייץ.
דוד.

ברוכי | דסקל - המרכז להלבשה אמריקאית בע"מ &lt;bruchi@ddaskal.com&gt;: 2017-03-29 18:02 GMT+03:00

---------- Forwarded message ----------
From: **david rutner** &lt;david@ddaskal.com&gt;
Date: 2017-03-29 18:00 GMT+03:00
Subject: Fwd:
To: bruchi b &lt;bruchi@ddaskal.com&gt;

---------- Forwarded message ----------
From: **Shulem Horowitz** &lt;sh9673@gmail.com&gt;
Date: 2016-04-14 0:30 GMT+03:00
Subject:
To: Bruchi Br &lt;bruchi@ddaskal.com&gt;, david rutner dask1234@gmail.com, &lt;david@ddaskal.com&gt;

Hi Mr. Daskal

Please send the next 2 payments to my Lawyers escrow account Find below details

1 on **4/21/16 $100,00.00**

2 on **5/2/16 $100,00.00**

It will be applied against your bills

Thanks

Shulem

G&G

# Wire Transfer to Deutsche Bank

# Wire to Deutsche Bank, 345 Park Avenue, New York, New York 10017, ABA Number 021-001-033

**Wire to Deutsche Bank, 345 Park Avenue, New York, New York 10017, ABA Number 021-001-033**

**For credit to Account of Avrom R. Vann, P.C. IOLA Account Number 42951816**

**Attention: Daphne Cales, (866) 362-4796**



23.4.2018

רשות המיסים - פרטי עוסק מורשה במע"מ



רשות המסים בישראל משרד האוצר
Israel Tax Authority
(http://www.taxes.gov.il)

 

# פרטי עוסק מורשה במע"מ

**עוסק מורשה**

**מספר תיק:**

38009957

**שם העוסק:**

דוידוביץ פריידא

**כנוי עסק:**

חסידיש

**מען:**

קדושת יום טוב 10 בני ברק

**ממונה אזורי:**

מע מ גוש דן

**סוג תיק:**

עוסק מורשה

| חזרה |
|------|

© (https://www.misim.gov.il/shaamMaster2010/odotShaamInt.html) אודות (http://www.taxes.gov.il) עמוד הבית
( https://www.misim.gov.il/ShaamMaster2010/copyRights.html) (http://www.gov.il ) 2010 כל הזכויות שמורות
לראש העמוד



At the District Court                                    Bankruptcy 25315-05-12
in Tel Aviv

**Before the Honorable Judge, Eitan Orenstein**

**In the Matter of:**    The Bankruptcy Ordinance (New Text), 5740-1980
                         (Hereinafter referred to as **"the Ordinance"**)

**And in the matter of: Adv. Eitan Erez**
                         In his capacity as the Special Administrator in Charge of the Assets
                         of the Debtor, Dov Mordechai Daskal (under receivership)
                         Of 23 Menachem Begin Road, 66184 Tel Aviv
                         Telephone: 03-5669002; Fax: 03-5669001

**And in the matter of: Adv. Benyahu Label**
                         In his capacity as the Special Administrator in Charge of the Assets
                         of the Debtor, Dov Mordechai Daskal (under receivership)
                         Of 11 Yitzhak Sade Street, Tel Aviv
                         Telephone: 03-5759220; Fax: 03-5759221
                                            (Hereinafter referred to as **"The Petitioner
                                            /Special Administrator"**)

```
The District Court in Tel Aviv
          Received
         08-11-2014

_____
The Recipient's Signature  (903)
```

**And in the matter of: Dov Mordechai Daskal, I. C. No. 057657553 (under receivership)**
                         Represented by his attorney, Adv. Ben Ner
                         Of 4 Berkovitz Street, 64238 Tel Aviv
                         Telephone: 03-6099166; Fax: 03-6093710
                                            (Hereinafter referred to as **"the Debtor"**)

**And in the matter of: Adv. Andy Schwartz**
                         Of 35 Tor HaZahav St., Petach Tikva. Zip Code 49778
                         Telephone: 036092746; Fax: 1533-6092746
                         E-mail: rslaw@netvision.net.il
                                            (Hereinafter referred to as **"the Respondent"**)

**And in the matter of: The Official Receiver**
                         Of 2 HaShlosha Street, Tel Aviv

## Response to the Petition Made by the Special Administrators (Petition No. 34)

Pursuant to the decision of this Honorable Court of 23.9.2014, which was served upon
me on the eve of the Jewish New Year (Rosh Hashana), and pursuant to an additional
decision dated 28.10.2014, the Petitioner is honored to give is response, as set forth
below:

**Page 13:**

The reason for the failure to forward those particulars is due, in all probability, by the fact that those particulars are details on the clients of the Special Administrator, who acts in the case at hand in two capacities – **One capacity is as the Special Administrator – and the other – as the attorney of those same clients**, who have <u>an interest in concealing</u> the matter of the transfer of the moneys, for which reason he refrains from forwarding those documents to the Respondent, which amount to incriminating them vis-à-vis the authorities in the USA.

As far as those clients have transferred the moneys, it is just obvious that they have at their disposal bank references in connection with those transfers, out of which it is possible to obtain all those particulars, which the Special Administrator so strongly wishes to receive and know!!

Presently, the suspicion clearly arises that those moneys are part of an intentional course of action involving <u>sophisticated money laundering</u>, which was taken by those same entities (third parties), as that same Bodsansky (or Weiss, as Adv. Mangel indicated to me in his alleged nickname) allegedly transferred moneys for the purpose of purchasing an asset through a Rumanian company, over which he has no right, and all of the shares were miraculously transferred to Eisdorfer <u>without consideration – Is that so??</u>

<u>**The matter even raises a suspicion of an offense thus committed according to the laws of the USA, as the same transferor is an American citizen who wished, in this way, to save his money and conceal his assets, and this contrary to the American law, for which reason the Special Administrator sought not to disclose the latter's particulars and not to incriminate him.**</u>

<u>**Could it possibly be the case that this Honorable Court should unconsciously aid the concealment of information of such kind, which the Special Administrator sought to commit, in which case, if were not for for the insistence of the Respondent (who is likewise an American advocate) on receiving the particulars of said transfer – the uncovering of the truth would have been prevented, and that this is the reason, for which to begin with, the requested documents had not been provided by the Special Administrator.**</u>

31. Further, I wish to point out that, all of a sudden, at an early morning hour at the end of 2007, I receive as phone call from an entity, which I do not identify and which presents itself as the owner of the land in Butimanu, namely Mrs. Rachel Eisdonfer, who then maintains that she purchased the land from the Debtor. I explained to Mrs. Eisdorfer that I have no idea who she is, **that she is by no means my client**, and that I receive the instructions solely from the Debtor.

32. Immediately upon receiving the phone call, I talked with the Debtor, and he informed me that he had got entangled with them, and that I have to effect the transfer and to act in accordance with the agreement entered into with the Rumanian seller for the purpose of transferring the ownership <u>**of both of the Rumanian companies soon (even though it emerges from the documents presented by the Special Administrator – the moneys were allegedly paid by Bodansky / Weiss and not by them).**</u>

During the meeting with the Eisendorfers, **upon the conclusion of the transaction**, in the course of the year 2008, I understood that they were supposed to be the owners of the land division belonging to the company K&R (with the first letter, respectively, starting for theior first names – Kalman and Rachel), and the remainder was supposed to belong to another entity, which the Debtor had allegedly "introduced to the transaction" by the name of Bodansky / Weiss.

**When the matter had become entangled with the Debtor, the latter requested me to take action to transfer the two companies into their name, whereby had in all possibility, found a solution for the moneys that the "second entity" had transferred to him and, as stated, after the fact, by way of committing money laundering.**

On that same occasion, I even asked the Debtor what would be the date of the moneys due to me, and the above-named person informed me that the matter would be handled by him upon completion of the transaction by me, **which promise was not kept by him as he broke off contact fully and immediately**.

As for the question posed by the Special Administrator as to why I had sued for the amount, then I will say that when it became clear to me what kind of person I had represented, and also in light of information I received about other victims, whom he had caught by trapping them – it became evident that this would be pointless, and I certainly did not wish the negative publicity deriving from this – such as the publicity today, under such constraints and against my wishes.

**Page 56**

72. Further, the Special Administrator wishes, in all probability, to exert pressure on the Seller to provider documents and/or evidence. However, this is about an illegitimate and unlawful pressure for the purpose of obtaining information that I do not possess and getting me into trouble with the Rumanian seller, nor is this necessary for the bankruptcy proceeding, as set forth above at great length.

As for the need for disclosing particulars of bank accounts of third parties, the matter laid down in the Skolar ruling (Leave to file a Civil Appeal 1917/92 – Skolar and others versus Jerby), in which it was established that:

"From the said balancing it mandatorily emerges that the first question the Court must answer is the extent, to which the information to be found in the bank accounts is essential and important for deciding the matter at issue between the parties (on the assumption that the statement of claim reveals a cause of action).

Secondly, the court must consider whether, prima facie, an evidentiary basis was provided, which justifies disclosing the accounts, as the mere allegation about the relevance and essentiality of the accounts is not sufficient, as this might be a camouflage for "fishing for evidence".

Thirdly, the partly seeking disclosure of bank accounts must convince the Court that it is not possible for it to be assisted by alternative evidence, which does not amount to infringement of privacy.

And finally, the extent of the disclosure of the accounts must not exceed what is strictly required for doing justice at that same judicial proceeding.

We have said all this as regards the disclosure of the accounts of a party to a litigation, with the latter objecting thereto (as this is about the latter's privilege, and once the latter was waived it, the bank is not in a position to say anything).

**As for the accounts of someone who is a stranger to the litigation – those may be disclosed "under extremely rare circumstances" (as stated in the Gozlan ruling [1] on p. 565), which I would principally limit to circumstances, in which it was asserted – and prima facie evidence was produced for that assertion – that the bank account is in fact an account of the litigant, even though it is not registered in the latter's name, or that a litigant transferred moneys to the account of that same third party in bad faith, for the purpose of concealing that fact, in collaboration with account owner. <u>All this after the third party, which might be adversely affected, has been given an opportunity to make its assertions and reservations about said disclosure. Not underlined in the original – A. Sh.).</u>**

In light of the above statements and the light of the fact that the bank accounts, to which the moneys were transferred, <u>**were proven by evidence to be accounts of the Rumanian Seller**</u>, the Special Administrator should – if he wishes to do so – conduct a legal proceeding in Rumania, in which he would lay out the evidentiary basis supporting the above statements, including his remaining assertions about such fraud as stated.

**However, it is evident that the Special Administrator has no evidentiary basis available, since if that were the case he would have taken this step a long time ago. Yet, he did not launch such proceedings, which matter gives cause for some doubts.**

I declare that the above name is my name, the signature below is my signature, and that the content of this affidavit of mine is the truth.

_____(-------------)_____
The Declarer's Signature

## CERTIFICATION

I, the undersigned, **Advocate Keren Aviv**, hereby certify that on 6.11.2014 appeared before me Andy Schwartz, who was identified by identity card no. 016822306, and that after I had cautioned him that he had to tell the truth, whole truth and nothing but the truth, and that he would liable for the penalties prescribed by the law if he failed to do so – he confirmed the truthfulness of his above declaration and signed it before me.

(------) (Seal):
Keren Aviv, Adv.
License o.: 61284

_____
Signature of the Recipient of the Affidavit

Adatvédelmi nyilvántartási azonosító: 909990001

| | | |
|---|---|---|
| **MAGYARORSZÁG**<br>**Hongrie**<br>**Hungary** |  | **HÁZASSÁGI ANYAKÖNYVI KIVONAT**<br>Extrait d'acte de mariage<br>**Extract from the Register of Marriages** |

Sorozat (Série / Series) **MB**      Okiratszám (Numéro / Number): **2244738**

Kiállító szerv:
Délivré par / Issued by  **Budapest Főváros Kormányhivatala**

**A házasságkötés**
Le mariage / The marriage

| | |
|---|---|
| Helye:<br>Lieu du mariage / Place of marriage | **New York (New York, Amerikai Egyesült Államok)** |
| Ideje:<br>Date du mariage / Date of marriage | **1986. év Année/Year  06. hó Mois/Month  08. nap Jour/Day**<br>(Ezerkilencszáznyolcvanhat június nyolc) |

**A férj**
L'époux / Husband

| | |
|---|---|
| Egyedi elektronikus anyakönyvi azonosítója:<br>Identifiant unique de registre électronique de l'état civil / Individual electronic registration ID | **SZ01543113** |
| Születési családi és utóneve(i):<br>Nom et prénom de naissance / Birth name and forenames | **Friedman Ahron Mordehai** |
| Házassági neve:<br>Nom et prénoms après le mariage / Name and forenames following marriage | — |
| Születési helye:<br>Lieu de naissance / Place of birth | **Ramat Gan (Izrael)** |
| Születési ideje:<br>Date de naissance / Date of birth | **1968. év Année/Year  02. hó Mois/Month  21. nap Jour/Day**<br>(Ezerkilencszázhatvannyolc február huszonegy) |

**A feleség**
L'épouse / Wife

| | |
|---|---|
| Egyedi elektronikus anyakönyvi azonosítója:<br>Identifiant unique de registre électronique de l'état civil / Individual electronic registration ID | **SZ01543459** |
| Születési családi és utóneve(i):<br>Nom et prénom de naissance / Birth name and forenames | **Adler Miriam** |
| Házassági neve:<br>Nom et prénoms après le mariage / Name and forenames following marriage | **Glauber Miriam** |
| Születési helye:<br>Lieu de naissance / Place of birth | **New York (New York, Amerikai Egyesült Államok)** |
| Születési ideje:<br>Date de naissance / Date of birth | **1968. év Année/Year  05. hó Mois/Month  19. nap Jour/Day**<br>(Ezerkilencszázhatvannyolc május tizenkilenc) |

Megjegyzések (Mentions / Notes):

A feleség Amerikai Egyesült Állam állampolgára.——

של גלאבר [מרים] על ידי אשר

**Budapest**

2015. év Année/Year  06. hó Mois/Month  05. nap Jour/Day

Gilyén Ince János
anyakönyvvezető

401800002600? – 85/135-1/2012 – 01 – 2014/1t-0166

| | Friedman Abron Mordehai |
|---|---|
| Név: | Ramat Gan (Izrael), 1966.02.21. |
| Születési hely, idő: | Friedman Judit |
| Anyja neve: | |

az alábbi adatokkal szerepel a nyilvántartásokban

| Lakóhelye: | 1132 Budapest, Kresz Géza utca 27. III/3. |
|---|---|
| Személyazonosító igazolvány okmányazonosítója: | 1 984891TA |
| Személyazonosító igazolvány kiadásának ideje: | 2 2015.07.31.   arcképmása csatolva |
| Személyazonosító igazolvány érvényességi ideje: | 3 2025.07.31. |
| | |
| Magánútlevél okmányazonosítója: | 1 BH1799814 |
| Magánútlevél kiadásának ideje: | 2 2015.07.28. |
| Magánútlevél érvényességi ideje: | 3 2025.07.28. |

Adatvédelmi nyilvántartási azonosító: 099090001

**MAGYARORSZÁG**
Hongrie
**Hungary**



**SZÜLETÉSI ANYAKÖNYVI KIVONAT**
Extrait d'acte de naissance
**Extract from the Register of Births**

Sorozat (Série / Series): **MA**  Okiratszám (Numéro / Number): **3456488**

Kiállító szerv:
Délivré par / Issued by: **Budapest Főváros Kormányhivatala**

| | |
|---|---|
| | **A gyermek** Lenfant / The child |
| Egyedi elektronikus anyakönyvi azonosítója: Identifiant unique de registre électronique de l'état civil / Individual electronic registration ID | **SZ201543113** |
| Születési családi neve: Nom de naissance / Birth name | **Friedman** |
| Születési utóneve(i): Prénom de naissance / Birth forenames | **Ahron Mordehai** |
| Neme: Sexe / Sex | **férfi Masculin/Male** |
| Születési helye: Lieu de naissance / Place of birth | **Ramat Gan (Izrael)** |
| Születési ideje: Date de naissance / Date of birth | **1966.** év Année/Year **02.** hó Mois/Month **21.** nap Jour/Day (Ezerkilencszázhatvanhat február huszonegy) |
| Apjának születési családi és utóneve(i): Nom et prénom de naissance du père / Birth name and forenames of father | -- |
| Anyjának születési családi és utóneve(i): Nom et prénom de naissance de la mère / Birth name and forenames of mother | **Friedman Judit** |
| Származási helye: Lieu d'origine / Place of origin | **Tel Aviv-Yafo (Izrael)** |
| Megjegyzések (Mentions/Notes): | |

**Budapest**

2015. év Année/Year 06. hó Mois/Month 05. nap Jour/Day

Gilyén Ince János
anyakönyvvezető

401800026001 – 85/136 1/2012 – 01 – 2014/1 –0184

BEVÁNDORLÁSI ÉS ÁLLAMPOLGÁRSÁGI HIVATAL
ÁLLAMPOLGÁRSÁGI IGAZGATÓSÁG

Postacím: Budapest, Pf.: 314/24.
1903

Szám: 106-A-08092/2014.                    Hiv.sz.: KIR: 2029/2013.

Magyarország Nagykövetsége

**Tel Aviv**

Hivatkozott számú megkeresésére értesítem, hogy **Friedman Ahron Mordehai** (Ramat Gan, 1966. február 21., anyja neve: Friedman Liba) a magyar állampolgárságról szóló 1993. évi LV. törvény 2. § (1) bekezdése alapján **magyar állampolgár.**

Budapest, 2015. július 16



                                             dr. Erdei Péter
                                     mb.főosztályvezető-helyettes